RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0120p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RYAN K. SUMLIN,

*Defendant-Appellant*.

No. 18-3819

─────────────

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:15-cr-00319-3—Donald C. Nugent, District Judge.

Decided and Filed: April 21, 2020

Before: GIBBONS, KETHLEDGE, BUSH, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ON BRIEF:** Mark Wettle, Louisville, Kentucky, for Appellant. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

─────────────

## OPINION

─────────────

JOHN K. BUSH, Circuit Judge. Ryan Sumlin appeals his conviction for distribution of drugs that caused the death of Carrie Dobbins, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), which carries enhanced penalty provisions. Sumlin argues that the district court should have excluded evidence obtained from a search of his residence because the affidavit supporting the search warrant was invalid. He also contends that Amanda Kelly (Carrie's sister and Sumlin's ex-girlfriend who had bought drugs from him) should not have been allowed to

provide certain testimony about his past relationship with Carrie.[1]  Finally, Sumlin claims that there was insufficient evidence to show that he distributed the drugs that caused Carrie's death.

For the reasons outlined below, we find that (1) the district court properly denied Sumlin's suppression motion, given that the affidavit established a sufficient nexus between his drug trafficking activity and residence; (2) the court properly admitted Kelly's testimony, as it was intrinsic proof that was relevant for providing background information and contextualizing the government's case against Sumlin; and (3) sufficient evidence supported the jury's verdict that Sumlin distributed the drugs that caused Carrie's death. Therefore, we **AFFIRM**.

## I.

This case arises from the fatal drug overdose of Carrie Dobbins in Akron, Ohio, on March 28, 2015.  Carrie's mother, Julie Dobbins, found her daughter's lifeless body in the basement of her home.  For years, Carrie had struggled with heroin addiction.  On the day of her death, Carrie had ingested a lethal level and combination of drugs.  It was a mixture that has tragically become far too common—heroine and fentanyl.

The chain of events leading to the overdose began in the early morning hours of that day.  Specifically, at 6:09 a.m., Carrie texted the telephone number (330) 815-4514, asking if "TJ" could come "see" her.  The number that Carrie texted was Sumlin's cellphone number, according to her sister, Amanda Kelly, who later cooperated with the police investigation.  Kelly also identified "TJ" as Sumlin, a heroin dealer who employed this alias when dealing drugs.  Kelly recounted that "TJ" had used a Facebook account under the name "RYO Boyer" and that the "About" section of this account listed "facebook.com/*ryansumlin*" as the contact email.  Kelly knew this information about Sumlin because she was his ex-girlfriend and had purchased heroin from him.  She also told police that Sumlin had dealt heroin to Carrie in the past.

In response to Carrie's text, Sumlin texted back "how much," to which she responded "35." (R. 177: Schmidt Trans., PageID 1404–14 & Exhibit 140, PageID 1655).  Sumlin texted his agreement, notifying Carrie that he was "on[] [his] way" to her mother's house.  (*Id.*).  Carrie

---

[1]We refer by first name to Carrie Dobbins and her mother, Julie Dobbins, to distinguish between them.

then texted for Sumlin to wait until her mother had left for work, which would be around 6:45 a.m. Carrie also instructed him to park on the side street next to the house to avoid detection.

When Julie Dobbins left for work that morning, she noticed a dark-colored Chrysler, matching the description of Sumlin's car, parked on the side street next to her house. At approximately 8:45 a.m. that same morning, Kelly arrived at her mother's house. A vehicle that Kelly identified as Sumlin's car—a Chrysler 300 with tinted windows—was parked in the driveway. Upon entering the house, Kelly saw Sumlin with Carrie in the living room.

Following Carrie's death, and between the span of April 24, 2015 and April 27, 2015, Akron Police Department Detective Mike Schmidt visited an address believed to be Sumlin's residence on Firestone Boulevard in Akron. Detective Schmidt saw a Chrysler 300—the same model of car seen by Amanda Kelly and Julie Dobbins on the morning of March 28, 2015— parked in the driveway of the Firestone Boulevard address. Although the car was registered to Sumlin's mother, police records confirmed that Sumlin had been arrested while driving the vehicle in 2014. Further investigation revealed that the utilities of the Firestone Boulevard residence were paid for by Sumlin's then-current girlfriend. Also, according to a police report stemming from an unrelated assault complaint filed in April 2015, Sumlin was identified as living there with this girlfriend. Additional police records from prior years, relating to Sumlin's arrests for the possession of heroin, the possession of cocaine, parole violations, failure to comply with police, and willful fleeing, further connected him to the Firestone Boulevard property.

Aware of these facts, the police turned their focus on Sumlin as a suspect. Based on his personal experience and training,[2] Detective Schmidt prepared an affidavit using the information obtained from the police investigation, including interviews with Julie Dobbins, Amanda Kelly,

---

[2]Detective Schmidt's qualifications included eighteen years of experience with the Akron Police Department. At the time of the victim's death, Detective Schmidt was assigned to the Akron Narcotics Detail.

Dr. George Sterbenz,[3] and Akron Detective Benjamin Surblis,[4] to obtain a search warrant for the Firestone Boulevard residence.

The affidavit sought authority to search for any evidence relating to drug trafficking, which could include heroin, currency, records and documents, and cellular telephones. Detective Schmidt was particularly focused on locating the (330) 815-4524 telephone, which Sumlin used to communicate with Dobbins on the morning of March 28, 2015. On April 27, 2015, the warrant was approved by Akron Municipal Court Judge Jerry K. Larson. The following day, the Akron police executed the search warrant. Officers seized a number of items, including approximately 190 grams of then-suspected cocaine (which upon further testing, was determined to be fentanyl), 48 grams of suspected heroin; drug trafficking paraphernalia (i.e. multiple scales, a press, a grinder, glassware with residue); $11,920 cash in one location; $2,482 in another location; and eight cellular telephones.

On August 26, 2015, a grand jury initially indicted Sumlin for drug trafficking. On August 17, 2016, a grand jury returned a superseding indictment against Sumlin and several others. After Sumlin's co-defendants pleaded guilty, the grand jury returned a supplemental indictment against Sumlin. This indictment charged Sumlin with the following: (1) distribution of drugs on March 28, 2015 that caused Carrie's death, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(c), which also triggered the enhanced penalty provision for drug distribution causing death; (2) possession of fentanyl with the intent to distribute on April 28, 2015, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); and (3) possession of heroin with the intent to distribute on October 9, 2015, in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(B).

On June 18, 2017, Sumlin filed a motion to suppress the government's evidence that provided the foundational basis for these charges. After Sumlin waived a hearing on his suppression motion, the district court denied the motion on August 30, 2017. Finding the search

---

[3]Dr. Sterbenz is the Chief Deputy Medical Examiner with the Summit County Medical Examiner's Office. On March 28, 2015, he performed an autopsy on Dobbins.

[4]Detective Surblis was the second of the Akron detectives to arrive at the scene of Carrie's death on March 25, 2018. At the scene, he found evidence of Carrie's recent drug use, including a hypodermic needle and spoon and a small paper container consistent with a bindle.

warrant valid, the district court concluded that the government's supporting affidavit established a sufficiently strong nexus between Sumlin's residence and the drug activities being investigated by the police. Because the government had shown probable cause for the search warrant, the district court held that Sumlin's rights under the Fourth Amendment, as applied to the states by the Fourteenth Amendment, had not been violated. Alternatively, the court held that even if the affidavit had not provided a sufficient basis for probable cause, the evidence should not be excluded based on *United States v. Leon*, 468 U.S. 897 (1984), because it still would have been reasonable for the police to rely on the warrant in good faith.

Following the district court's denial of Sumlin's motion to suppress, Sumlin was tried on April 24-30, 2017, and a jury convicted him of all three counts charged on the indictment. On May 24, 2017, the district court sentenced Sumlin to a term of life imprisonment, as well as a six-year term of supervised release. In accordance with the court's rulings, an amended judgment was entered on May 26, 2017. This timely appeal followed.

## II.

### A.    Validity of the Search Warrant

Sumlin challenges the search warrant as inadequate under the Fourth Amendment, which provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This constitutional protection, applicable here through the Fourteenth Amendment, requires that a warrant to search a residence be supported by an application showing probable cause. The affidavit supporting the warrant must contain facts that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005); *United States v. Frazier*, 423 F.3d 526. 531 (6th Cir. 2005). If "a government agent fails to support his application with this showing of probable cause, a judge should refuse to issue the warrant." *United States v. McCoy*, 905 F.3d 409, 515 (6th Cir. 2018). "Our review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four-corners of the affidavit[.]" *Frazier*, 423 F.3d at 531. Nonetheless, because "the probable cause standard is a

'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life," *Frazier*, 423 F.3d at 531 (citation omitted), a finding that probable cause exists can "depend[] on the totality of the circumstances." *Id.*

Sumlin challenges the finding of probable cause on the grounds that Detective Schmidt's affidavit failed to include facts establishing a sufficient nexus between his residence and his suspected drug distribution activities. In particular, he compares the instant affidavit with the one at issue in *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), which this court ultimately determined lacked a sufficient nexus. Specifically, referencing *Brown*, Sumlin argues that the affidavit in this case "lack[ed] any mention of any illicit activity" at the Firestone Boulevard residence. (Appellant Sumlin Br. at 15–19). Sumlin also argues that this omission bars the application of the *Leon* good-faith exception in the alternative. We need not address the *Leon* exception here because, as discussed below, we hold that the search warrant complied with the Fourth Amendment.

When evaluating a district court's ruling on a motion to suppress evidence, "we review the trial court's factual findings for clear error and its legal conclusions de novo," *Frazier*, 423 F.3d at 531. "The standard of review for determining the sufficiency of the affidavit is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (internal quotation marks omitted). A magistrate's probable cause determination is entitled to "great deference," *id.*, and "the evidence must be viewed in a light most likely to support the decision of the district court." *Frazier*, 423 F.3d at 531 (citation omitted); *see United States v. Heath*, 259 F.3d 522, 528 (6th Cir. 2001).

We agree with the district court that Detective Schmidt's affidavit established a sufficient nexus between Sumlin's drug-trafficking activity and his Firestone Boulevard residence to justify the magistrate judge's finding of probable cause. The probable cause analysis involves several components. The government's affidavit needed to demonstrate probable cause (1) that Sumlin was trafficking drugs; (2) that Sumlin lived at the Firestone Boulevard residence; and (3) that evidence of drug trafficking would be found at Sumlin's residence. The government accomplished all three tasks in sufficient detail.

First, as Sumlin appears to concede, the affidavit set forth probable cause to show he was in the illegal drug trade. Relatedly, the affidavit, which includes information and medical confirmation of Carrie's death, shows that she died on March 28, 2015 of a drug overdose. Connecting these pieces, evidence on Carrie's cellphone established that she had exchanged text messages with "TJ"—Sumlin's confirmed drug alias—early in the morning of March 28, 2015. Though the two used coded language, it is reasonable to believe that during this conversation, Sumlin agreed to bring drugs to Carrie. The affidavit also includes witness testimony of the decedent's sister, Amanda Kelly, who not only had purchased drugs from Sumlin, but also had been his girlfriend. Based on her past involvement with Sumlin, Kelly confirmed that he was in fact a drug dealer. Furthermore, according to Kelly, she saw Sumlin in the living room of her mother's residence with her sister at approximately 8:45 a.m. on the morning of March 28, 2015, and his car was in the driveway of her mother's residence. The affidavit also outlines that "TJ's" cellphone number, Facebook account, automobile, and picture were all connected to Sumlin. Collectively, these facts in the affidavit establish probable cause to believe that Sumlin trafficked drugs.

Secondly, we agree with the government and the district court that the affidavit showed specific detail to establish probable cause that Sumlin lived at the Firestone Boulevard residence. Sumlin's car (registered to his mother), which had been seen at the residence of Julie Dobbins (Carrie's mother) on the morning of March 28, 2015, was subsequently observed by police to have been parked in the driveway of the Firestone Boulevard property on multiple days following Carrie's death. The utilities at the residence were under the name of Sumlin's then-girlfriend. Moreover, earlier that month, police had responded to a domestic disturbance at the residence relating to a fight between Sumlin and his then-girlfriend. And finally, the mother of Sumlin's then-girlfriend told police that Sumlin lived in the Firestone Boulevard residence. Collectively, this evidence not only seems sufficient, but appears overwhelming in its support of the probable cause determination that Sumlin lived at the subject property of the search warrant.

Given these facts in the affidavit, we also agree with the government and the district court that the affidavit established probable cause to believe that evidence of Sumlin's drug trafficking would be found at the Firestone Boulevard residence. "[I]n the case of drug dealers, evidence is

likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (internal quotation omitted). Therefore, "an affidavit containing credible, verified allegations of drug trafficking, verification that said defendant lives at a particular residence, combined with the affiant officer's experience that drug dealers keep evidence of dealing at their residence," can be sufficient to demonstrate a nexus between the criminal activity and the suspect residence to validate the warrant—even "when there is absolutely no indication of any wrongdoing occurring at that residence. . . ." *United States v. Goward*, 188 F. App'x 355, 358–59 (6th Cir. 2006). In fact, we have even gone so far to determine the existence of "a nexus between a defendant's residence and illegal drug activity with *no facts* indicating that the defendant was dealing drugs from his residence." *McCoy*, 905 F.3d at 418 (emphasis added). Instead, we determined that a "defendant's record of past drug convictions coupled with recent, reliable evidence of drug activity" is sufficient to establish the nexus. *Id.*; *see also United States v. Miggins*, 302 F.3d 384, 393 (6th Cir. 2002) (finding probable cause existed to support search of defendant's residence based on affidavit's outlining of defendant's prior cocaine-related convictions coupled with officers' same-day observations of him signing for a package containing a large amount of cocaine delivered at someone else's residence).

Based on this authority, the government's affidavit established the requisite nexus. It provided facts showing that Sumlin was a drug trafficker and that he resided at Firestone Boulevard. As Detective Schmidt related in the affidavit, he knew from his personal experience and training that drug dealers like Sumlin routinely keep drug-related items (i.e. records of their drug transactions, equipment, supplies, and weapons) at their residences. Akron police officers also observed Sumlin's car—the same one seen by witnesses parked next to the home of Carrie's mother on the morning of March 28, 2015—parked at the Firestone Boulevard residence multiple times following Carrie's death. We agree with the emphasis placed by the district court on the timing of the text messages exchanged between Carrie and Sumlin. Namely, the back-and-forth exchange, which occurred within a span of twenty-nine minutes,[5] suggested that

---

[5]Note that Carrie's request for drugs and Sumlin's immediate response that he would bring her drugs, occurred between 6:09 a.m. and 6:18 a m. Also, at precisely 6:14 a.m. Sumlin texted "on.my [sic] way," to which Dobbins responded that he should wait until her mother had departed for work. (R. 177: Schmidt Trans., PageID 1404–14 & Exhibit 140, PageID 1655). At 6:24 a.m. and 6:37 a m., Carrie received two short telephone calls from Sumlin. Finally, at 6:38 a.m., she sent him one last message indicating that her mother would be leaving in a couple

Sumlin was at his home when Carrie texted that morning, and then necessarily was leaving from his home to deliver the drugs to Carrie. Finally, the Akron police were aware of recent evidence that Sumlin was drug-dealing, as stated in the affidavit. Connecting the pieces of this analysis, there was a sufficient nexus existing between Sumlin's drug trafficking-related activity and his residence.

Furthermore, we agree with the district court that Sumlin's reliance on *United States v. Brown*, 828 F.3d 375, 383–84 (6th Cir. 2016) is misplaced. In *Brown*, we found the government's search warrant on defendant's residence to be invalid, given that the affidavit "contained *no* evidence that [defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." *Id.* at 382. (emphasis added). The affidavit also lacked any evidence showing that defendant had sold drugs in the recent past, that he had a car directly tied to his drug trafficking activities, that such car was parked at his suspected residence, or in fact, that there were any suspicious communications tying his criminal activities to the suspect residence.

Here, by contrast with *Brown*, there was evidence showing a connection between Sumlin's alleged drug trafficking and the Firestone Boulevard property. We agree with the district court that the timing of the text message exchange between Sumlin and Carrie suggested that Sumlin was coming from the Firestone Boulevard residence. Equally, there was substantial reason to believe that Sumlin lived at the Firestone Boulevard property and that the car that was spotted at the residence of Julie Dobbins on the morning of Carrie's death in that house was the same car parked later that day at the Firestone Boulevard property. Consequently, the police had probable cause that additional evidence of Sumlin's drug trafficking, including the cellular telephone linked to the (330) 815-4515 number used to text Dobbins, would be found at the Firestone Boulevard property.

The district court properly denied Sumlin's motion to suppress the search warrant for his residence, because it is clear that the "four corners of the search warrant affidavit" establish a sufficient nexus between Sumlin's residence and his criminal activity of drug dealing. *Id.* at 380.

---

of minutes. At approximately 6:45 a.m., as she left for work, Julie Dobbins saw a car matching Sumlin's car description parked on the side of her home with its lights off.

Because Detective Schmidt's affidavit established a sufficient nexus between Sumlin's residence and the criminal activity, there was no Fourth Amendment violation.

## B.      The Admission of Amanda Kelly's Testimony

### 1.      "Relevancy" under FRE 401 and FRE 402

Sumlin appeals the district court's decision to admit Amanda Kelly's testimony relating to the scope of her past relationship with him.  He argues that the testimony was not intrinsic to the case because it showed no connection to his alleged drug dealings with Carrie Dobbins.  Furthermore, Sumlin argues that the testimony should have been evaluated and found inadmissible under a Federal Rule of Evidence 404(b) analysis, given that the evidence was not probative of a material issue in the case, but instead, was inadmissible character evidence.  Rebutting these claims, the government advances that Kelly's testimony related to her past use of drugs and her purchases from Sumlin was proper background evidence and inextricably intertwined with the rest of her testimony.  In the alternative, the government argues that such evidence would be properly admitted even under Rule 404(b).  The government has the better of the argument.

We review a district court's decision to admit testimony and other evidence under an abuse of discretion standard.  *United States v. Tocco*, 200 F.3d 401, 414 (6th Cir. 2000); *see United States v. Bonds*, 12 F.3d 540, 554 (6th Cir. 1992).  "An abuse of discretion exists where the reviewing court is firmly convinced that a mistake has been made."  *United States v. Whittington*, 455 F.3d 736, 738–39 (6th Cir. 2006); *see United States v. Williams*, 952 F.2d 1504, 1518 (6th Cir.1991).  "An erroneous admission of evidence that does not affect the 'substantial rights' of a party is considered harmless, and should be disregarded."  *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) (quoting *Gibson v. United States*, 271 F.3d 247, 254 (6th Cir.2001)).  Furthermore, "[t]he standard for relevancy is extremely liberal."  *United States v. Whittington*, 455 F.3d 736, 738–39 (6th Cir. 2006) (internal quotations omitted).  "'[E]vidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence' is relevant."  *Robinson v. Runyon*, 149 F.3d 507, 512 (6th Cir. 1998) (quoting Fed. R.

Evid. 401). "[E]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative worth." *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 475 (6th Cir. 1996) (internal quotations omitted).

Given these directives, we deem Amanda Kelly's testimony about her past drug-related and personal relationship with Sumlin, to be relevant. Kelly was Carrie's sister, Sumlin's former client, and also his former girlfriend. Kelly testified that she saw her sister with Sumlin at her mother's residence at approximately 8:45 a.m. on March 28, 2015. Kelly also testified that Carrie had abused drugs in the past and continued to do so, and that Sumlin was a drug dealer, who had routinely delivered drugs to her at her mother's same residence in the past. Prior to the introduction of this testimony, Sumlin's attorney objected to the line of questioning on relevancy grounds. However, the government offered a strong foundation for the testimony's relevance, explaining that this evidence was necessary both to contextualize the relationship between Kelly and Sumlin, and to explain how Kelly could identify "TJ" the drug dealer, as Sumlin. The government also explained that the evidence was relevant to Kelly's motives for testifying. After Sumlin's attorney eventually conceded that her client was a drug dealer and had had past relationships with both Carrie and Kelly,[6] the district court determined that Kelly's testimony was relevant. Nonetheless, the court also agreed to give the jury a limiting instruction as to how to consider the testimony at the beginning of Kelly's testimony and during its jury charge.

Furthermore, even if Kelly's testimony alone would have been insufficient to prove Sumlin's conviction under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), as discussed above, this court's "relevance threshold is very low under Rule 401, [a]nd . . . the government is permitted to build an incremental case." *Whittington*, 455 F.3d 736, 739. And here, simply because Kelly's

---

[6]Prior to the district court concluding that Kelly's testimony was relevant, the following exchange occurred between the judge and Sumlin's defense counsel:

THE COURT:   What's the defense here, Rhonda?
MS. KOTNIK:  For that witness or -
THE COURT:   In general. I mean, listened to the opening statements, but -
MS. KOTNIK:  The drugs that he provided are not the drugs that killed her.
THE COURT:   So you're not disputing the fact that they had a relationship with a drug dealer?
MS. KOTNIK:  Correct. Correct.

(R. 175: Trial Trans., PageID 1114–15).

testimony may or may not prove Sumlin's crime, "does not mean, necessarily" that the contextualizing evidence Kelly provides is irrelevant. *Id.* Therefore, we conclude that the district court did not abuse its discretion in admitting Kelly's testimony.

## 2.	"Intrinsic" versus "Extrinsic" Evidence

In light of our above assessment, we disagree with Sumlin's characterization of Kelly's testimony as barred by Rule 404(b). Rule 404(b) "does not apply to evidence that itself is probative of the crime charged[.]" *United States v. Price*, 329 F.3d 903, 906 (6th Cir. 2003). Such probative proof includes "intrinsic acts" evidence that relates to those acts that "were necessary preliminaries to the crime charged." *United States v. Daulton*, 266 F. App'x 381, 384 (6th Cir. 2008) (citation omitted). Furthermore, even if the evidence at issue relates to a defendant's uncharged criminal conduct, the evidence still is admissible if the conduct "arises from the same events as" and "is directly probative of [defendant's] charged offense[.]" *United States v. Clay*, 667 F.3d 689, 698 (6th Cir. 2012).

To demarcate the scope of admissible "intrinsic evidence" from proof that falls under the scope of Rule 404(b)'s exclusion, our circuit uses the following framework:

> Rule 404(b) does not apply where the challenged evidence is "inextricably intertwined" with evidence of the crime charged in the indictment. When the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed "extrinsic." "Intrinsic" acts on the other hand, are those that are part of a single criminal episode.

*United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) (citing *United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982)). Note as well, that evidence relating to the background of the charged offense, known as "*res gestae* evidence," is also considered "intrinsic" and admissible, meaning the court would not undertake a Rule 404(b) analysis:

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*United States v. Hardy (Marlondo)*, 228 F.3d 745, 748 (6th Cir. 2000).

In light of this authority, we find that Amanda Kelly's testimony, in which she reveals her previous drug use and past drug purchase history from Sumlin, constituted both proper *res gestae* evidence, as well as evidence that is "inextricably intertwined" with evidence of Sumlin's conviction under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). At a foundational level, Kelly's historic drug dealings with Sumlin help contextualize (1) how she knew Sumlin was "TJ," (2) how she recognized Sumlin's car in her mother's driveway on the morning of her sister's death, and (3) how she identified Sumlin as the individual in the living room with her sister at 8:45 a.m. on the same morning.

Kelly's previous interactions with Sumlin also help de-code the text messages in which Carrie Dobbins appears to request drugs and Sumlin agrees to drop them off. Without any level of background knowledge of Sumlin's past drug dealings with Kelly and Carrie, the texts, in isolation, could appear cryptic. There were no explicit references to drugs, or even popular drug code words in the conversation, which would have aided in confirming that the text message exchange was indeed, about a drug deal. Without any background knowledge, the number "35" (Carrie's response to Sumlin's question of "how much") could have been referring to "35" units of *any* type of commodity. (R. 177: Schmidt Trans., PageID 1404–14 & Exhibit 140, PageID 1655). However, as the government argues, and as we agree, Kelly's testimony as to her past relationship and dealings with Sumlin is "integral," in that it completes the story of Sumlin's charged offense under 21 U.S.C. §§ 841(a)(1) and (b)(1)(C)—namely, that those "35" units discussed in the text exchange could reasonably have been interpreted as "35" units of fentanyl or heroin, which was the quantity of drugs that Sumlin, operating under the alias "TJ," distributed to Carrie and that ultimately led to her death. Moreover, as Kelly explained, because Sumlin had prior dealings with both her and her sister, when he asked Carrie "how much" following her request to "come over," he did not have to ask where to deliver the drugs. (*Id.*).

Significantly as well, we find the testimony to represent both "intrinsic" and proper background evidence in clarifying Kelly's motives for testifying, as well as revealing any potential bias she harbored against Sumlin, which could have prejudiced his case. The Supreme Court characterizes bias as "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, [her] testimony in favor of or against a party."

*United States v. Abel,* 469 U.S. 45, 52 (1984). "Bias is always relevant in assessing a witness's credibility." *Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999). Furthermore, Federal Rule of Evidence 607 permits a party to proactively introduce potential impeachment evidence during direct examination prior to the defense having the opportunity to present the same evidence during cross-examination. Kelly's testimony relating to her past drug use and prior sexual relationship with Sumlin was directly relevant to her credibility.[7] The district court, therefore, did not abuse its discretion when it allowed the government to inform the jury of impeachment facts through Kelly's direct testimony, rather than wait for them to be introduced in her cross-examination.

For the aforementioned reasons, we classify Kelly's evidence as both "intrinsic" and relevant, and therefore, properly admitted by the district court. Given this holding, we need not analyze Sumlin's alternative argument regarding the testimony's applicability under a Rule 404(b) analysis.

### C.     Sufficiency of the Evidence

Finally, Sumlin challenges the sufficiency of the government's evidence supporting count three of the indictment—that he distributed drugs to Carrie Dobbins, and that those drugs caused her death.[8] Specifically, Sumlin argues that there was insufficient evidence to show beyond a reasonable doubt, that he was the one who distributed the drugs that caused the death, because on the morning of March 28, 2015, Carrie made attempts to contact several other drug dealers.

---

[7]Namely, Kelly was an admitted recovering drug addict, who had previously purchased drugs from Sumlin and had experienced great difficulty in her attempts to stop her heroin abuse. Importantly as well, Kelly had known Sumlin for years as a drug dealer, classmate, and girlfriend. At the time of Carrie's death, Kelly maintained a social relationship with some of Sumlin's family members.

[8]Sumlin does not contest that he was a drug dealer, and consequently, concedes his guilt under counts two and three. Indeed, during closing arguments, defense counsel gave "permission" to the jury to convict on those counts:

> [Y]ou've heard that Ryan sells illegal drugs, and that probably doesn't sit well with you right now. On April 28th and October 9th, both of those times, he was caught with different quantities and different types of drugs. . . . And he's taken responsibility for those actions. And you have permission to hold him accountable for those counts in Count 2 and 3.

(R. 177: Sumlin Closing, PageID 1576).

Relatedly, he contends that although Kelly saw him in the living room with Carrie, Kelly never actually saw him giving her drugs.

"[A] defendant claiming insufficiency of the evidence bears a heavy burden." *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998); *see United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir.1994). In evaluating such claims, "we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt." *Maliszewski*, 161 F.3d at 1005 (citing *United States v. Riffe*, 28 F.3d 565, 567 (6th Cir.1994)); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "We draw all available inferences and resolve all issues of credibility in favor of the jury's verdict, and it is not necessary for us to exclude every reasonable hypothesis but guilt." *U.S. v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997).

The charge as to which Sumlin contends there was insufficient evidence—count three—indicted him for possessing heroin with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), with the enhanced sentencing penalty of 21 U.S.C. § 841(b)(1)(B). To establish illegal narcotics distribution in violation of 21 U.S.C. § 841(a), the government had to prove that Sumlin (1) knowingly or intentionally distributed fentanyl and heroin, and (2) at the time of such distribution, Sumlin knew that the substances were fentanyl and heroin. *See United States v. Colon*, 268 F.3d 367, 376 (6th Cir. 2001). To sustain the enhanced penalty of 21 U.S.C. § 841(b)(1)(B) related to this charge, the government had to prove Sumlin's knowing or intentional distribution of an illicit drug, and that another's death resulted from the use of that drug. *Burrage v. United States*, 571 U.S. 204, 210 (2014).

As noted, Sumlin does not contest that he was a drug dealer. Therefore, the only question we are faced with is whether there was sufficient evidence to support the jury's finding of count three—that Sumlin distributed the particular drugs that killed Carrie Dobbins on March 28, 2015.

Breaking down this inquiry into sub-elements, we conclude initially that the government introduced substantial evidence supporting the fact beyond a reasonable doubt that drugs killed the victim. First, the government's presented proof from the autopsy and toxicology screening

performed on Carrie following her death, which demonstrated to a medical certainty that a fentanyl overdose caused her death. In this regard, not only did the autopsy fail to show evidence of trauma, injury, stroke, heart attack, or any other cause as responsible for Carrie's death, but, in fact, the only notable external or internal injury documented on her body was a small puncture wound in her inner arm—a puncture that was consistent with recent drug use. Additionally, aside from showing that Carrie had recently used heroin and fentanyl, the forensic toxicology results revealed that she had a "lethal level" of fentanyl in her bloodstream at the time of death. Assessing these results, Dr. Sterbenz, the Chief Deputy Medical Examiner with the Summit County Medical Examiner's Office who performed the autopsy following Carrie's death, testified that "to a reasonable degree of medical certainty . . . Carrie died due to her active illicit drug abuse," and very likely died on March 28, 2015 because of the amount of fentanyl and heroin she had ingested. Adding external validity to these claims, the Akron police officers who found Carrie's body in her bedroom on the morning of March 28, 2015, reported that she died near a hypodermic needle, spoon, and a paper bindle—all paraphernalia used for the ingestion of drugs like fentanyl and heroin.

The government also introduced substantial evidence to prove beyond a reasonable doubt that Sumlin provided the drugs that caused Carrie's fatal overdose. Again, the text message evidence revealed the back-and-forth exchange between Carrie and Sumlin that led to the drug deal. Despite Sumlin's contentions, this conversation was neither cryptic nor vague. Detective Schmidt testified that based on his extensive training and experience, he interpreted the conversation as referring to a drug transaction. Also, Kelly testified regarding Carrie's ongoing drug addiction, Sumlin's drug distribution activities, and past incidents in which both sisters bought drugs from Sumlin. Based on this evidence, it would have been reasonable for the jury to conclude that Carrie's text exchange with Sumlin referred to a drug transaction. This conclusion is also underscored by the fact that Carrie then requested that Sumlin wait to arrive until after her mother left for work, and to park his car on the side of her house.

Also, as noted, Amanda Kelly and Julie Dobbins identified a vehicle that matched Sumlin's Chrysler 300 at Julie's home on the morning her daughter died there. Kelly saw him in the living room with Carrie around 8:45 a.m., and within three hours, Carrie was dead.

Dr. Sterbenz testified that Dobbins died of a fentanyl overdose at sometime between 9:00 a.m.—the time when Kelly left her mother's house—and noon. In light of these temporal facts, a reasonable jury could have concluded that Sumlin was the last person to have seen the victim before she died and that his delivery of drugs to her caused her death.

Finally, Sumlin's behavior following Carrie's death could also reasonably be interpreted as suggesting his involvement. According to the testimony of Detective Schmidt, after searching online and confirming Carrie's death, Sumlin immediately changed his telephone number and instructed his contacts to "lose" the old number. Additionally, during his interview with officers, Sumlin made a number of false statements, denying that he: (1) knew Carrie; (2) ever sold her drugs; (3) had ever sold drugs at all; (4) lived at the residence on Firestone Boulevard; and (5) drove a Chrysler 300. Also, according to Detective Schmidt, during recorded telephone calls between Sumlin and his girlfriend and relatives, Sumlin indicated that his life was "over" and stated that he should have run from the police upon his apprehension.

Choosing not to respond to any of the government's evidence, Sumlin instead references the fact that Carrie made several attempts on the morning of March 28, 2015 to contact other drug dealers in likely pursuit of drugs. And indeed, there were text messages from Carrie to several other drug dealers, in addition to Sumlin, on that morning. However, her contact with these other dealers was *prior* to her texts with Sumlin, at the end of which Sumlin appeared to agree to bring her drugs. Furthermore, an analysis of Carrie's phone records from that morning fails to reveal any indication that the other suspected dealers whom she contacted, actually agreed to deliver her drugs. Equally, there is no evidence that any drug dealer other than Sumlin actually met with Dobbins on the morning of March 28, 2015. Nor is there evidence that another drug dealer supplied Dobbins with fentanyl.

Consequently, based upon our review of this collective evidence in the light most favorable to the government, we hold that the government submitted sufficient proof for count three, and in particular Sumlin's enhanced sentencing penalty, demonstrating that Carrie died from a fentanyl overdose and that Sumlin knowingly supplied her with the drugs that produced her death.

**III.**

In light of the above, (1) we **AFFIRM** the district court's finding of the search warrant's validity because the government's affidavit showed a sufficient nexus between Sumlin's criminal activity and the Firestone Boulevard residence; (2) we **AFFIRM** the district court's admission of Kelly's testimony regarding her past relationship with Sumlin and his past drug transactions, given its intrinsic nature and relevance to the government's case; and (3) we **AFFIRM** the jury's verdict that Sumlin distributed the fentanyl that ultimately caused the death of Carrie, as the government submitted sufficient evidence in support of both elements of the enhanced statutory penalty.