NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0648n.06
Case No. 19-3784

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Nov 13, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| JOHN SIMER II, | ) | OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:**    **DAUGHTREY, DONALD, and READLER, Circuit Judges.**

**CHAD A. READLER. Circuit Judge.**    Nicole Ferris died from a drug overdose. Toxicology tests of her blood revealed a deadly polydrug cocktail of heroin and fentanyl, combined with carfentanil, a substance dramatically more lethal than the others. Following the presentation at trial of various forms of evidence indicating that John Simer sold drugs to Ferris shortly before her overdose, a jury convicted Simer on numerous charges relating to Ferris's death.

Simer now challenges his conviction on a host of grounds, primarily on the theory that the carfentanil was supplied by another source. The jury, however, heard this same argument when it convicted Simer. And as a court of "review, not first view," our task is simply to ensure that the evidence presented was sufficient for a rational juror to convict Simer. *United States v. Houston*,

792 F.3d 663, 669 (6th Cir. 2015).  Finding ample evidence to support Simer's conviction, we affirm.

## BACKGROUND

*Nicole Ferris's Death*.  Detectives from the Warren (Ohio) Police Department began investigating John Simer, nicknamed "Casper," in response to a tip-line call about possible drug activity at Simer's home.  Searches of Simer's trash yielded evidence of drug distribution: suboxone pills, plastic baggies testing positive for trace amounts of crack cocaine, and so-called "lottery bindles" used to package drugs.  Officers also initiated traffic stops on suspicious vehicles leaving Simer's home.  Nicole Ferris, one of the drivers stopped by officers, had in her possession a pill crusher and a drug residue-covered straw for snorting narcotics.  Officers, however, chose to release her without charges.

A few weeks later, Ferris died from a drug overdose.  The events leading to her death were described at trial by Clifford Raynovich, who had moved in with Ferris in an attempt to reconcile their on-again-off-again relationship.  The two struggled with drug addiction.  The day before her death, Ferris complained to Raynovich about opiate withdrawal pain.  Neither had any money to buy drugs.  So Ferris called a contact named "Casper" to ask if he could "front" them some drugs.  Simer refused, telling them to obtain money and call back.  Raynovich and Ferris decided to sell the wheel rims from Ferris's car the next day to get the money.

Early the next morning, Ferris spoke with her landlord, who described Ferris as seeming tired, but as otherwise lucid and sober.  Ferris then drove to the scrapyard with Raynovich.  Upon selling the wheel rims, Ferris called "Casper."  Ferris and Raynovich then drove to Simer's home.  When they arrived, Raynovich waited in the car while Ferris made the drug purchase.  Ferris

emerged after "maybe ten minutes" with heroin and crack cocaine, indicating that Simer had "blessed" them with more drugs than they had asked for.

As soon as the two arrived home, Ferris disappeared into the bathroom. She returned with a pile of white powder on her cell phone, indicating it was the heroin purchased from Simer, and that she had already ingested half. Ferris complained that "this stuff is stronger than what she's used to," and that it made her sick. Raynovich snorted the rest of the powder off of Ferris's phone, and the two had sex before passing out.

Later that day, Ferris's landlord received a series of incoherent phone calls and texts from Ferris's two-year old, who was playing with Ferris's phone. After calling Ferris to no avail, the landlord instructed his son to knock on Ferris's door. No one responded. The landlord called 911 and raced home, arriving before the paramedics. After knocking down the door, the landlord found Ferris and Raynovich unconscious and in bed. He roused Raynovich. But he knew it was too late to save Ferris. Paramedics declined to administer Narcan or CPR, with rigor mortis having already set in on Ferris's body.

Officers photographed and collected into evidence the various drug paraphernalia found at the scene. Multiple straws for ingesting narcotics were found, at least one of which tested positive for heroin. A blood sample taken from Ferris and sent for testing and analysis revealed heroin/fentanyl/carfentanil intoxication as her cause of death.

When Detective Melanie Gambill arrived at the crime scene, she recognized Ferris's van as one of the cars she had stopped leaving Simer's home a few weeks earlier. And forensic analysis of Ferris's phone revealed multiple outgoing calls and texts to a contact named "Casper" associated with Simer's phone number. Based on this evidence and Raynovich's interview with the police, Gambill suspected Simer was responsible for selling the fatal drug cocktail to Ferris.

*Simer's Interrogation.* One month after Ferris's death, officers executed a search warrant at Simer's residence. As officers were detaining Simer, he blurted out: "I know what this is about. This is about Nicky dying." During the ensuing search, officers recovered a loaded semi-automatic pistol, drug packaging materials, and various illegal narcotics, including a heroin/fentanyl mixture, but no carfentanil.

At the police department, Gambill interrogated Simer. During the videotaped interrogation, Simer confessed to selling drugs and admitted ownership of the drugs found at his residence. But when Gambill confronted Simer with the fact of Ferris's overdose death, Simer invoked his right to counsel and terminated the interview. Gambill informed Simer that the interview had concluded and that no more questions would be asked about the events of the case. Simer requested a cigarette break, and Gambill escorted him outside.

Over the cigarette break, Gambill and Simer struck up a conversation, which Gambill captured "with a recorder on [her] person." Gambill mused about why famous athletes and wealthy individuals choose to sell drugs. Simer replied that he was personally "addicted" to the drug dealer lifestyle, boasted of his dangerous reputation in the city, and accepted that he was now "paying the ultimate price." The audio recording of this exchange was played three times by the prosecution at trial.

*Arrest and Trial.* Nearly six months later, police obtained a warrant for Simer's arrest. While executing the warrant at Simer's home, officers found additional drug packaging materials, narcotics, and firearm accessories, including body armor and ammunition. The officers also found a package of drugs that tested positive for a fentanyl/heroin/carfentanil mixture. Simer admitted that everything in the home was his. A grand jury later indicted Simer on 13 counts of various drug and weapon charges stemming from Ferris's death and the contraband seized from Simer's

4

home. Count 1, distribution resulting in death, *see* 21 U.S.C. § 841(b)(1)(C), carried a mandatory minimum 20-year sentence.

At trial, the government's witnesses included Raynovich, Gambill, other witnesses who implicated Simer as the supplier of the drugs that killed Ferris, and three medical examiners. Collectively, the medical examiners testified that lab results indicated that Ferris's blood contained lethal doses of heroin metabolites, fentanyl, and carfentanil. Carfentanil, the examiners explained, is a fentanyl analogue 100 times more potent than fentanyl and 10,000 times more potent than morphine—lethal even in microscopic doses. Carfentanil has no human-approved medical purpose; its only legitimate use is sedating elephants and other large zoo animals. The medical examiners further testified that Ferris was a relatively healthy person who would not have died without ingesting this combination of drugs. And, they added, while each of the drugs in Ferris's system were concerning, the presence of carfentanil was most alarming.

The jury found Simer guilty on all counts, including the death-results enhancement. With the mandatory minimum 20-year sentence included, the district court sentenced Simer to 720 months incarceration. Simer filed a timely appeal, challenging only his conviction for Count 1, which included the death-results enhancement.

## SUFFICIENCY OF THE EVIDENCE

Simer first argues that the government failed to present sufficient evidence that he distributed the carfentanil that caused Ferris's death. He concedes the record could support a conclusion that he sold heroin (or even a heroin/fentanyl mixture) to Ferris on the day of her death. But he argues the government failed to establish that the drugs Simer sold Ferris were the "but-for" cause of her death without the effect of carfentanil. On a sufficiency challenge, we must uphold a jury verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt after viewing the evidence in the light most favorable to the

prosecution. *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020). As Simer preserved this issue by moving for acquittal in the district court, we review the issue de novo. *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015).

For Simer to qualify for a § 841(b)(1)(C) death-results enhancement, the government had to prove that (1) Simer knowingly or intentionally distributed a controlled substance and (2) "death result[ed]" from the use of "such substance." *United States v. Abrams*, 811 F. App'x 342, 347–48 (6th Cir. 2020). The government can satisfy this standard by showing that Simer's distribution was a "but-for" cause of Ferris's death. *United States v. Jeffries*, 958 F.3d 517, 518 (6th Cir. 2020). "But-for" causation occurs when the distributed drug "'combines with other factors to produce' death, and death would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage v. United States*, 571 U.S. 204, 211 (2014)).

*Other Dealer Theory.* Simer argues that no rational juror could conclude that he sold the heroin/fentanyl/carfentanil mixture found in Ferris's system when she died. In a nutshell, Simer asserts that reasonable doubt exists as to whether the fatal drug mixture came from another unknown intervening source—for example, another dealer or the untested drug paraphernalia found in Ferris's room.

Adequate evidence exists to uphold the jury's verdict. At this stage, we must consider the evidence in the light most favorable to the prosecution; we do not "weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury." *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (citation omitted). In that respect, the record reveals a tight temporal proximity between Ferris's purchase from Simer and her death, evidence from which a jury could conclude that Simer's drugs contained carfentanil. Ferris's landlord described

Ferris as sober the morning of her death. Raynovich testified that he and Ferris went to the scrapyard that morning to sell wheel rims for money to buy drugs. Phone records indicated that Ferris called Simer within minutes of selling the rims. Simer admitted that he sold heroin to Ferris. He further admitted that heroin is often mixed with other drugs, meaning addicts are never sure what they are getting when they buy drugs. Lab results indicated that Ferris died of a heroin/fentanyl/carfentanil overdose. Raynovich testified that he and Ferris consumed the drugs received from Simer almost immediately upon leaving Simer's residence and arriving home. And other than the brief amount of time Ferris was in the bathroom before consuming the drugs, Raynovich testified that he was with Ferris the entire day, and that they took no other drugs.

While the government concedes its case against Simer on carfentanil distribution was circumstantial, "[c]ircumstantial evidence alone is sufficient to sustain a conviction," as "such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994) (citation omitted). Consider, for example, our recent decision in *United States v. Sumlin*, 956 F.3d 879 (6th Cir. 2020). Like Simer, Sumlin admitted he sold heroin, but denied selling a fentanyl/heroin mixture that killed its buyer. *Id.* at 892. Circumstantial evidence of Sumlin's guilt included text exchanges between Sumlin and the buyer, a three-hour timeframe between the sale of drugs and the buyer's death, and Sumlin's suspicious behavior after the buyer's death. *Id.* Collectively, that evidence was sufficient to support a rational jury's conclusion that the buyer died from a fentanyl/heroin mixture sold by Sumlin. *Id.* at 892–93. So too here as to Simer.

Simer's conjecture over the possibility of unknown intervening sources of drugs is not unfamiliar in this setting. Nor is it typically compelling. *See, e.g.*, *United States v. Davis*, 970 F.3d 650, 655 (6th Cir. 2020); *Hamm*, 952 F.3d at 738–39; *United States v. Allen*, 716 F. App'x

447, 450 (6th Cir. 2017). Sufficiency arguments based on speculation over other drug dealers' operating "in the same area," or that an eyewitness "did not actually see [the defendant] hand over drugs," are commonly rejected, sometimes "out of hand." *United States v. Whyte*, 795 F. App'x 353, 364 (6th Cir. 2019) (alteration in original) (citation omitted). True, in *United States v. Ewing*, we found insufficient evidence to support a § 841(b)(1)(C) death-results enhancement. 749 F. App'x 317, 329 (6th Cir. 2018). But *Ewing* was the exceptional case that featured a large "unexplained gap in the evidence." *Id.* There, the government asserted that Ewing sold a heroin/fentanyl mixture that caused the victim's death. *Id.* But in studying the victim's blood, toxicologists concluded it was "highly unlikely [the victim] had used heroin 'in the several hours before his death.'" *Id.* Simer's arguments pale in comparison. He emphasizes the presence of untested paraphernalia in Ferris's apartment, her relationship with other dealers in the area, and past animosity between Simer and Raynovich. But those arguments either go to credibility concerns we cannot review or are simply speculative possibilities already rejected by the jury. *See Graham*, 622 F.3d at 448.

*Other Drug Theory.* Simer alternatively contends that even if a rational juror could find that he sold a drug mixture to Ferris, no rational juror could conclude that his *particular* drug mixture killed Ferris. To that end, all agree that a heroin/fentanyl/carfentanil mixture was the "but-for" cause of Ferris's death. And Simer admits that he sold Ferris the first, and perhaps even the second, of those ingredients. But, he says, the government failed to show the heroin or fentanyl alone were "independently sufficient" to cause Ferris's death. On that point, Simer emphasizes testing from the government's toxicological experts, who acknowledged that "there is no way to separate" the effect of heroin, fentanyl, and carfentanil on Ferris's death. Simer thus contends the

8

government "hung its case for causation on proving Simer sold carfentanil," yet never presented sufficient evidence linking Simer to that substance.

This argument fails for the same reasons as does Simer's first one. The government offered enough circumstantial evidence for a rational jury to conclude that the drug mixture Simer sold Ferris was the same that killed her. Case in point, Simer's sale of an unknown drug mixture to Ferris came in close temporal proximity to Ferris's dying of a carfentanil overdose. And as Simer himself admitted, drug addicts are never sure what they are getting when they buy drugs. A jury could thus conclude Simer's drug cocktail was the "but-for" cause of Ferris's death.

## 21 U.S.C. § 841(b)(1)(C)

Simer next asserts two interpretative challenges to the application of § 841(b)(1)(C)'s "death-results" enhancement. Simer first requests a new trial on the ground that the statute should be read to contain an implicit proximate cause requirement. Our recent decision in *United States v. Jeffries*, however, forecloses this argument. 958 F.3d at 520–21. *Jeffries* held that § 841(b)(1)(C) has no proximate cause requirement because it is "always foreseeable" that death could result from the use of a controlled substance distributed in violation of § 841(a)(1). *Id.* at 521. The death-results enhancement, it follows, requires only proof of "but-for causation." *Id.*

Next, Simer argues that § 841(b)(1)(C) is ambiguous, meaning that, employing the rule of lenity, we should interpret § 841(a)(1)'s intentional and knowing *mens rea* requirement to extend to the "such substance" language of the death-results enhancement in § 841(b)(1)(C). Doing so, says Simer, would require that a drug dealer have "knowledge" of every controlled substance in a drug mixture that causes death before the death-results enhancement could be imposed. Here too, *Jeffries* belies Simer's argument. Rejecting the idea that § 841(b)(1)(C)'s death-results enhancement was ambiguous, *Jeffries* held that § 841(b)(1)(C) contains the "express *mens rea*

requirement" of "knowingly or intentionally" imported from § 841(a)(1). *Id.* at 522–23. Thus, § 841(b)(1)(C) requires only that "death . . . result[]" from an intentional or knowing sale of *any* controlled substance, not knowledge or intent as to the actual substance causing death. *Id.*; *see also United States v. Villarce*, 323 F.3d 435, 439 (6th Cir. 2003) (citations omitted) (holding that the government need not prove "mens rea as to the type and quantity of the drugs" sold to establish a violation of § 841); *United States v. Thornton*, 822 F. App'x 397, 406 n.1 (6th Cir. 2020) (citing *McFadden v. United States*, 576 U.S. 186, 191 (2015)) (rejecting a sufficiency challenge to a § 841(b)(1)(C) enhancement based on the government's failure to prove defendant knew he was selling carfentanil, as defendant must know only that the substance he is selling is, in fact, a controlled substance). And here, Simer does not dispute that the government proved at least his knowing sale of a controlled substance to Ferris beyond a reasonable doubt.

## EVIDENTIARY ISSUES

*Fifth Amendment.* Simer challenges the admission of his recorded conversation with Gambill, which Simer alleges was obtained in violation of his Fifth Amendment rights, given his invocation of his *Miranda* rights. As a threshold matter, we note that Simer failed to raise a pre-trial motion to suppress his statements to Gambill, as required by Criminal Rule 12(b). *See* Fed. R. Crim. P. 12(b)(3)(C) (providing that a request for suppression of evidence "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without trial on the merits"). Under an earlier version of Rule 12, an untimely suppression motion automatically precluded all appellate review. *United States v. Ramamoorthy*, 949 F.3d 955, 962 (6th Cir. 2020). But after Rule 12's amendment in 2014, we no longer treat "the failure to file a motion as a waiver unless the circumstances of the case indicate that the defendant intentionally relinquished a known right." *Id.* (citation omitted). Where a defendant

instead merely forfeited his rights, we may (but are not required to) conduct a plain error review of a forfeited suppression claim. *Id.* (citing *United States v. Olano*, 507 U.S. 725, 735 (1993)). Here, there is no indication Simer waived his claim by intentionally relinquishing his rights. *See Olano*, 507 U.S. at 733 ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (citation omitted)). Among other reasons, Simer's appellate counsel alleges that it was impossible to raise such a claim because trial counsel received the audio tape on the day of trial.

In the absence of an intentional relinquishment of Simer's Fifth Amendment rights, *Ramamoorthy* counsels us to assess whether the dispute turns on a question of law or of unresolved facts—and if it is the latter, to decline to exercise plain error review. 949 F.3d at 962–63. That is so, *Ramamoorthy* explains, in view of our "comparative inaptitude at finding facts," which makes us ill-equipped to re-create the fact-intensive and focused nature of a suppression hearing. *Id.* at 963. The absence of such a hearing, moreover, runs the risk of "paint[ing] a misleading picture, even if, from behind the appellate bench, [facts] 'appear to have been well developed.'" *Id.* at 963 (quoting *United States v. Finch*, 998 F.2d 349, 355 (6th Cir. 1993)). So while plain error review "might be appropriate" for suppression claims raising pure legal questions, we typically decline to exercise plain-error review "in the ordinary case." *Id.* at 964.

Today's case is more akin to the "ordinary" one, as Simer's Fifth Amendment claim is laden with unresolved factual questions. Once a suspect invokes his right to counsel, as the government does not dispute Simer did, law enforcement may not interrogate a suspect further unless the suspect reinitiates "further conversations or exchanges" with the police. *Abela v. Martin*, 380 F.3d 915, 925 (6th Cir. 2010). Whether Gambill violated Simer's *Miranda* rights thus

11

turns on whether her post-invocation questions constituted an "interrogation," that is, "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Gambill's use of a recording device may be compelling evidence of her subjective intent to elicit incriminating statements from Simer. Yet our "focus[ is] primarily upon the perceptions of the suspect." *Id.* And in the absence of a suppression hearing, the record fails to demonstrate Simer's perceptions at the time of Gambill's questions, nor does it answer other fact-intensive questions surrounding each's state of mind.

Other unresolved factual disputes further hamper our ability to hear Simer's suppression claim. Take, for example, the determination whether Simer reinitiated questioning. *See Henness v. Bagley*, 644 F.3d 308, 320 (6th Cir. 2011) ("An *Edwards* reinitiation occurs when, without influence by the authorities, the suspect shows a willingness and a desire to talk about his case."). That task is particularly perilous here in light of the over 20 minutes of missing audio that might otherwise capture the discussion leading up to Simer's challenged admission. With these unresolved questions of fact front and center, we decline to reach Simer's Fifth Amendment challenge.

*Rule 404(b).* Invoking Federal Rule of Evidence 404(b), Simer asserts two challenges to the admission of evidence that carfentanil was seized from his home six months after Ferris's death. Rule 404(b) bars admission of evidence of a "crime, wrong, or other act" to prove a person's character or show that a person "acted in accordance with that character" on a particular occasion. Fed. R. Evid. 404(b)(1). Such "other-acts" evidence is admissible for other purposes, like proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

12

1. Simer first argues that the district court erred in rejecting his Rule 404(b) challenge to the admission of evidence that he possessed carfentanil long after his drug sale to Ferris. Although courts have not spoken with one voice on the exact standard of review for Rule 404(b) challenges brought on appeal, all ultimately agree that we may only reverse an evidentiary ruling if the error affected Simer's "substantial rights." Fed. R. Crim. P. 52(a); *see Abrams*, 811 F. App'x at 347 (collecting cases). Evidence of prior bad acts, to be sure, may carry "unusual weight with juries." *Abrams,* 811 F. App'x at 348. But erroneous introduction of that evidence is harmless when "the weight of the improperly admitted evidence was slight in the context of the trial as a whole." *Id.* (citation omitted).

Any error in admitting the carfentanil evidence was unlikely to affect the outcome of Simer's trial. Simer admitted that he sold drugs to Ferris. And the temporal proximity between Simer's sale of drugs and Ferris's death was sufficient for a jury to find that he sold carfentanil, even without the admission of the later-seized carfentanil. When balanced against the weight of evidence presented at trial, the evidence of Simer's carfentanil possession would not have prejudiced his substantial rights.

2. Simer next argues that the district court's limiting instruction was inadequate to mitigate the prejudicial inferences drawn by the jury from the admission of the carfentanil evidence. Simer did not object to the proposed instructions or propose additional limiting instructions at the time, so we review the issue only for plain error. Fed. R. Crim. P. 30(d), 52(b); *United States v. Hobbs*, 953 F.3d 853, 857 (6th Cir. 2020).

The district court instructed the jury to consider the carfentanil evidence for the purpose of "intent, opportunity, knowledge, identity, absence of mistake, or absence of accident":

> You have heard the testimony that the defendant committed acts other than the ones charged in the superseding indictment. If you find the defendant did those

acts, you can consider the evidence only as it relates to the government's claim on the defendant's intent, opportunity, knowledge, identity, absence of mistake, or absence of accident. You must not consider it for any other purpose.

Remember that the defendant is on trial here only for the crimes charged in the superseding indictment, not for the other acts. Do not return a guilty verdict unless the government proves the crimes charged in the superseding indictment beyond a reasonable doubt.

While these instructions, the government concedes, did link other-acts evidence with uncharged conduct, they were otherwise a "clear[], simpl[e], and correct[]" recitation of the proper uses of Rule 404(b) evidence, mirroring the limiting instruction found in the Sixth Circuit Pattern Jury Instructions. *United States v. Davis*, 547 F.3d 520, 527–28 (6th Cir. 2008); Pattern Crim. Jury Instr. 6th Cir. 7.13 (2019 ed.). It bears noting, moreover, that we regularly decline to find a district court's jury instructions plainly erroneous when those instructions closely track the Sixth Circuit's pattern instructions. *See United States v. Damra*, 621 F.3d 474, 499–500 (6th Cir. 2010) (collecting cases).

Simer responds that these instructions were not sufficiently specific to prevent the jury from drawing prejudicial inferences. But the cases he cites do not support the point. *See United States v. Jobson*, 102 F.3d 214 (6th Cir. 1996); *United States v. Randolph*, 205 F.3d 1342 (6th Cir. 2000) (unpublished table decision). Both *Jobson* and *Randolph* turned on inaccurate and confusing jury instructions that left the jury without proper direction on how to consider evidence. In *Jobson*, jurors were instructed that they could consider evidence only "for the purposes stated to you," but were never instructed on those purposes. *Jobson*, 102 F.3d at 222. And in *Randolph*, the court found that jurors were instructed to consider Rule 404(b) evidence for "whatever relevance the jury chose to assign to it with regard to the issues they were faced with deciding" other than guilt or innocence, with no further guidance. *Randolph*, 205 F.3d at *6. The instructions in *Jobson* and *Randolph*, in other words, look vastly different from those here, where the district

court told the jury the purposes for which they could (and could not) consider the "other acts" evidence.

The district court perhaps could have been more precise about why it included these particular limiting instructions. After all, we have sometimes admonished district courts that boilerplate instructions, which do "have their place," nonetheless should not be given "without careful consideration . . . to their applicability to the facts and theories of the case being tried." *United States v. Wolak*, 923 F.2d 1193, 1198 (6th Cir. 1991). But in the absence of the issue being joined below, the instructions here do not amount to plain error affecting Simer's substantial rights.

## CONCLUSION

The judgment of the district court is **AFFIRMED**.