**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 17a0099n.06

Case Nos. 15-5838/5872

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| FELIX AGUNDIZ-MONTES (15-5838); | ) | KENTUCKY |
| ALBERTO LARA-CHAVEZ (15-5872), | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

**FILED**

Feb 08, 2017
DEBORAH S. HUNT, Clerk

BEFORE: ROGERS, SUTTON, and COOK, Circuit Judges.

COOK, Circuit Judge. A jury convicted Alberto Lara-Chavez and Felix Agundiz-Montes of various crimes arising from a drug-trafficking operation that straddled the Kentucky-Ohio border. The defendants appeal their convictions and sentences. We AFFIRM.

**I. Background**

The defendants' drug-trafficking venture began in mid-2012, when Agundiz-Montes signed a lease for a warehouse in Florence, Kentucky. Within months, 100 to 200 pounds of marijuana started arriving weekly. Sometimes, Lara-Chavez drove to Oklahoma to haul the marijuana to the warehouse. Other times, his contacts in Texas mailed marijuana-filled boxes to local Kentucky addresses where Lara-Chavez's associates would retrieve them.

Every time a shipment arrived, Lara-Chavez's coconspirators divided, repackaged, and then sold the marijuana. Both defendants participated in varying ways. Agundiz-Montes functioned as a processor and a seller. Lara-Chavez recruited coconspirators, arranged major deals, and organized others to perform essential tasks such as guarding the drugs at the warehouse.

In February 2013, Lara-Chavez expanded into the heroin business, turning a house in nearby Warsaw, Kentucky into the base for the expansion. The Warsaw house's workflow mimicked that of the Florence warehouse, with heroin from Mexico arriving in bulk a few times per month, and Lara-Chavez's heroin team—which included individuals from his marijuana team—repackaging the heroin into tiny balloons for its customers. Several of the heroin team members lived at the Warsaw house to protect the drugs, while others occupied a nearby apartment—an annex where they also stored and sold drugs.

In contrast to Lara-Chavez's hands-on management of the heroin trafficking, Agundiz-Montes had less involvement with heroin; he mainly procured heroin samples only when his customers requested some. Regardless, he continued to help import and distribute marijuana even after he learned that the conspiracy had expanded into the heroin trade.

In the third extension of his trafficking enterprise, Lara-Chavez rented a house in Sardinia, Ohio, a rural town north of the Kentucky border. In addition to using the property for the storage and sale of drugs, Lara-Chavez's coconspirators cultivated a marijuana field. Throughout this time, Lara-Chavez and his coconspirators continued processing and selling heroin.

Within a year of renting the Sardinia house, federal agents conducted a sting operation that nabbed sixteen conspiracy members. Three defendants chose not to plead guilty, including the two appealing their convictions here.

Following an eight-day trial, the jury found Agundiz-Montes guilty of conspiring to distribute marijuana and heroin (21 U.S.C. § 846), attempted possession of marijuana with the intent to distribute (21 U.S.C. § 846), and conspiring to commit money laundering (18 U.S.C. § 1956(h)); and Lara-Chavez guilty of, among other crimes, conspiring to distribute marijuana and heroin (21 U.S.C. § 846), conspiring to commit money laundering (18 U.S.C. § 1956(h)), and engaging in a continuing criminal enterprise (21 U.S.C. § 848).

The district court sentenced Agundiz-Montes to 155 months of imprisonment and Lara-Chavez to 353 months of imprisonment. The district court also held the defendants jointly-and-severally liable for all proceeds from the drug-trafficking. They timely appealed their convictions and sentences.

## II. Prejudicial Variance

Agundiz-Montes argues that the government created a prejudicial variance when it charged a single drug conspiracy in the indictment, but presented evidence at trial that sufficed to prove two separate conspiracies: one for marijuana and one for heroin. We disagree and affirm because the government provided enough evidence for a rational jury to find an overarching drug-trafficking conspiracy.

We review a variance claim raised at trial de novo. *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006) (citing *United States v. Solorio*, 337 F.3d 580, 589 (6th Cir. 2003)). But where the defendant raises a variance claim for the first time on appeal, we review for plain error. *United States v. Adams*, 722 F.3d 788, 805 (6th Cir. 2013) (citing *United States v.*

*Swafford*, 512 F.3d 833, 841 (6th Cir. 2008)). Agundiz-Montes' other co-defendant, Jose Lara, objected at trial, but Agundiz-Montes did not raise his own variance argument at trial or join Lara's objection. Agundiz-Montes nonetheless presses for de novo review, arguing that Lara's objection did the double duty of preserving his variance claim as well. *See United States v. Baker*, 458 F.3d 513, 517–18 (6th Cir. 2006) (citing cases that hold that a codefendant's objection can preserve an error for purposes of appeal). Because Agundiz-Montes cannot show a prejudicial variance under either standard, we accord his claim de novo review.

To succeed on his claim, Agundiz-Montes must show that a variance occurred and that the variance prejudiced his case. *Caver*, 470 F.3d at 235–37. In the conspiracy context, a variance occurs when "an indictment alleges one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies." *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982) (emphasis added). We test for a variance by construing the evidence "in the light most favorable to the government" and then assessing whether a rational trier of fact could find that each defendant "had knowledge of and agreed to participate in a single, overarching conspiracy." *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). This court considers three factors to determine whether a single conspiracy exists: (1) "the overlapping of the participants in various dealings," (2) "the nature of the scheme," and (3) "the existence of a common goal." *Id.* Only if we find a variance do we then measure the degree of prejudice—that is, the extent to which a jury improperly imputes the conspiratorial activities of a codefendant to the defendant, or otherwise becomes confused about which defendant participated in which conspiracy, *United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985)—by evaluating whether "the error of trying multiple conspiracies under a single indictment substantially

influenced the outcome of the trial." *Caver*, 470 F.3d at 237 (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1956)).

On all three variance factors, the government provided ample evidence to support a rational juror's finding of a single, overarching conspiracy. For the overlapping-personnel factor, Agundiz-Montes concedes that trial testimony showed at least five core personnel playing a substantial role in the processing, sale, or transportation of both marijuana and heroin. In one example, a conspirator who repackaged and peddled heroin from the drug house in Warsaw, Kentucky later tended the marijuana field in Sardinia, Ohio. Another coconspirator who traveled to California to pick up marijuana seeds also sold heroin. Agundiz-Montes himself repackaged marijuana, sold marijuana and heroin, and arranged for marijuana to be mailed to Kentucky. Several of the overlapping coconspirators also socialized and lived in dwellings that stored both drugs. *See Smith*, 320 F.3d at 653 (citing evidence that coconspirators spent recreational time together as proof of a single overarching conspiracy).

As to the nature of the scheme, the record suggests that the coconspirators blended the marijuana operation with the heroin operation. The all-cash rent payments for the Warsaw house (where the bulk of the heroin processing took place) likely came from the proceeds of marijuana sales. The coconspirators stashed both drugs at multiple residences and, in one instance, attempted to settle marijuana debts by exchanging heroin. The same personnel who sold or processed marijuana oftentimes sold or processed heroin. Several customers purchased both drugs from Lara-Chavez's sellers.

Finally, the conspiracy's collective actions reveal a common goal of profiting from the underground drug market in northern Kentucky. That the group began offering heroin to accommodate their customers' changing tastes does not undermine the existence of a single

conspiracy.  *See United States v. Olea-Coronado*, 391 F. App'x 508, 509–10 (6th Cir. 2010); *see also United States v. Wilson*, 168 F.3d 916, 924 (6th Cir. 1999).

Agundiz-Montes acknowledges this evidence, but instead argues for separate conspiracies based on the different leadership of each.  That is, he insists Lara-Chavez "headed" the marijuana operation, and two other coconspirators "ran" the heroin operation.  But who led the conspiracy is irrelevant because all three individuals held overlapping functions in both the marijuana and heroin operations.

Agundiz-Montes also characterizes his role in the heroin conspiracy as de minimis.  This argument fails, too.  "Once the existence of the conspiracy is proven, only slight evidence is necessary to connect a defendant with the conspiracy."  *United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989).  Moreover, a defendant need not participate in all parts or know all other conspirators to be members of the conspiracy.  *United States v. Castaneda*, 315 F. App'x 564, 567 (6th Cir. 2009) (citing *Warner*, 690 F.2d at 549); *United States v. Shermetaro*, 625 F.2d 104, 108–09 (6th Cir. 1980).  Here, Agundiz-Montes continued to manage the delivery of marijuana through commercial carriers after he learned about the heroin operation.  His knowledge of heroin sales, combined with his sustained involvement in the drug-trafficking scheme despite that knowledge, provided a rational jury with sufficient evidence to infer that he participated in the conspiracy with full knowledge of its scope.

Because we find no variance—and thus no possibility that the guilt of his coconspirators or activities of a separate conspiracy improperly influenced the conviction of Agundiz-Montes— we do not address the question of whether a variance prejudiced the trial outcome.

### III. Admissibility of Agent Sagrecy's Testimony

Lara-Chavez asserts that the district court plainly erred when it determined that it would not exclude, *sua sponte*, Special Agent Jeffrey Sagrecy's opinion testimony on money laundering. We find no reversible error.

Where a defendant fails to object to testimony at trial, we review the admission of that testimony for plain error. *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012) (citing *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007)). To succeed under this standard, Lara-Chavez must show a plain or obvious error that affects his substantial rights and "seriously affects the fairness, integrity, or public reputation of [his] judicial proceedings." *United States v. Collins*, 799 F.3d 554, 588 (6th Cir. 2015) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)).

At trial, Sagrecy highlighted where Lara-Chavez's bank records showed multiple whole-dollar cash deposits in amounts less than $10,000, suggesting an attempt to evade government detection of illegal activity. Based on witness testimony from coconspirators who deposited or wired money on Lara-Chavez's behalf, Sagrecy concluded that the deposits likely came from the proceeds of drug sales.

Later, the prosecution asked Sagrecy to define both concealment and promotional money laundering. The district court allowed Sagrecy to answer, in part, because it thought the defense would eventually raise an objection. Upon hearing no objection, the district court took the initiative by instructing the government to steer clear of asking for "an opinion on the ultimate issue," especially on "whether or not money laundering [had] occurred." Heeding the district court's warning, the government instead asked Sagrecy whether the evidence "was consistent

with both . . . types of [money] laundering."  Sagrecy cited further evidence—including the commingling of funds among Lara-Chavez's six accounts—in answering yes.

Lara-Chavez raises three challenges to Sagrecy's testimony: (1) Sagrecy bolstered the testimony of trial witnesses by relying on their testimony in forming his opinion; (2) Sagrecy impermissibly defined the legal terms "promotional money laundering" and "concealment money laundering" for the jury; and (3) portions of Sagrecy's testimony amounted to a legal conclusion.

We can dispatch Lara-Chavez's first claim because no bolstering occurred when Sagrecy relied on the testimony of others.  The Federal Rules of Evidence permit an expert witness "to listen to or read the testimony of other testifying witnesses and express an opinion or conclusion on this basis."  David H. Kaye, David E. Bernstein & Jennifer L. Mnookin, *The New Wigmore: A Treatise on Evidence: Expert Evidence* § 4.3.1 (2d ed. 2015) (citations omitted); *see also* Fed. R. Evid. 703 (cmt.) (stating in the Advisory Committee Notes that expert witnesses may rely upon "testimony establishing the facts" in formulating their opinions).

Lara-Chavez's second claim founders, too.  The district court's error of letting Sagrecy define legal terms, though arguably clear, *see Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994), left Lara-Chavez's substantial rights unaffected because Sagrecy's testimony aligned with the court's own jury instructions.

Lara-Chavez's final evidentiary challenge fares no better than the others because the error here, if an error at all, is not plainly obvious, but rather reasonably disputed.  Federal Rule of Evidence 704(a) permits expert testimony that "embraces an ultimate issue."  The rule gives the court plenty of leeway to determine when testimony merely suggests a legal conclusion (which is permissible) or when it encroaches upon a juror's duty to reach her own legal conclusion (which

is not). *Nixon*, 694 F.3d at 631 (citing *Torres v. Cty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)). Lara-Chavez complains that the government's questions—particularly the questions about whether certain evidence "was consistent with" money laundering—elicited legal conclusions. Although Sagrecy's answers strongly suggest a conclusion to the jury, they fall short of declaring his opinion on the ultimate issue of Lara-Chavez's guilt. *See United States v. Gomez-Norena*, 908 F.2d 497, 502 (9th Cir. 1990) (finding no plain error where an expert testified "that the defendant's actions . . . were consistent with possession with an intent to distribute cocaine," and the expert did not "speak to" the ultimate issue of defendant's mental state or mislead the jury). When combined with Sagrecy's explanation of the hallmarks of money laundering and his analysis of the evidence presented at trial, the record reveals no plain error.

## IV. Sufficiency of the Evidence

Lara-Chavez and Agundiz-Montes challenge the sufficiency of the evidence supporting their convictions for conspiring to commit money laundering. Additionally, Lara-Chavez raises a challenge to the sufficiency of the evidence supporting his conviction of engaging in a continuing criminal enterprise. The evidence supports the jury's findings of guilt on all these charges.

We review de novo a district court's denial of a motion for acquittal. *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (citing *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010)). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial, we must affirm. *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (quoting *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)).

A) Sufficiency of the Evidence for Money-Laundering Claims

The government charged Agundiz-Montes and Lara-Chavez with conspiracy to commit money laundering, which it could prove under a promotional theory, *see* 18 U.S.C. § 1956(a)(1)(A)(i), or a concealment theory, *see id.* § 1956(a)(1)(B)(i). To establish guilt under a promotional theory, the government must show that Agundiz-Montes and Lara-Chavez "conspired to conduct a financial transaction which involved the proceeds of unlawful activity, with knowledge that the money was the proceeds of unlawful activity, and with the intent to promote the underlying criminal activity." *United States v. Reed*, 264 F.3d 640, 650 (6th Cir. 2001) (citing *United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996)). To establish guilt under a concealment theory, the government must show that Agundiz-Montes and Lara-Chavez conspired to "conduct[] a financial transaction with criminal proceeds, with knowledge that the money was the proceeds of unlawful activity, and with knowledge that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the money." *Id.* at 650–51. The government need only support one of the two theories to prove the defendants guilty of conspiracy to commit money laundering. *United States v. Martin*, 516 F. App'x 433, 446 (6th Cir. 2013) (citing *United States v. Westine*, No. 92-3664, 1994 WL 88831, at *2 (6th Cir. Mar. 17, 1994) (per curiam)).

   i. *Lara-Chavez's challenge to his conviction for conspiracy to commit money laundering*

Lara-Chavez's brief makes no distinction between promotional and concealment money laundering. Nor does he address the elements of money laundering generally. Instead, he argues that because Sagrecy's testimony was inadmissible, the remaining evidence was insufficient to convict Lara-Chavez of conspiring to launder money. His argument fails.

Regarding the conspiracy to commit concealment money laundering, multiple witnesses testified that Lara-Chavez held six accounts at Chase Bank, directed his coconspirators to deposit cash in even, whole-dollar amounts no greater than $10,000, and shuffled funds between his personal and business accounts. When added to Sagrecy's properly admitted testimony (discussed above) and construed in the light most favorable to the government, a rational trier of fact could infer that Lara-Chavez conspired to conceal the illegal source of his money.

The evidence of promotional money laundering is equally strong. When drug proceeds came in, Lara-Chavez directed other coconspirators to make wire transfers to pay for additional drug shipments. Lara-Chavez also used drug proceeds to pay the rent for several of the properties where the coconspirators processed, stored, and sold drugs. A rational trier of fact could unquestionably find that Lara-Chavez conspired to commit promotional money laundering.

### ii. *Agundiz-Montes' challenge to his conviction for conspiracy to commit money laundering*

The government cites three examples of Agundiz-Montes's participation in promotional money laundering: paying money to coconspirators to transport drugs; wiring money to Mexico and California to purchase drugs; and paying cash to rent buildings where his coconspirators stored and sold drugs.

The evidence at trial showed that Agundiz-Montes paid two coconspirators to transport boxes of marijuana to the Florence warehouse. Although Agundiz-Montes calls attention to testimony that the money for the packages could have come from one-off home remodeling and maintenance jobs, the government presented countervailing evidence that would allow a jury to infer that such stints were insufficient to fund the regular $200 to $400 cash payments. Agundiz-Montes also directed his coconspirators to wire drug proceeds to purchase more drugs, and possessed a wire-transfer receipt at the time of his arrest. Finally, he signed a lease for the

warehouse in Florence and personally paid the first few months of rent using cash derived from drug sales. Assessing these actions individually or together, a rational jury could find that Agundiz-Montes conspired to carry out promotional money laundering.

Whether a rational juror could find that Agundiz-Montes knowingly participated in the concealment-money-laundering conspiracy is a closer call. Evidence of Agundiz-Montes's complicity consists mainly of: his asking a coconspirator to make cash deposits at a Chase Bank branch; his riding with a coconspirator to the bank and standing at a teller window during a deposit; and a bank slip and wire-transfer receipt found on his person when police arrested him. Construing this evidence in the light most favorable to the government, a rational juror could find Agundiz-Montes complicit in the concealment-money-laundering conspiracy. And in any event, Agundiz-Montes's conviction would still stand based on the promotional-money-laundering theory. *Martin*, 516 F. App'x at 446 (citing *Westine*, 1994 WL 88831, at *2); *cf. Griffin v. United States*, 502 U.S. 46, 56, 60 (1991) (upholding a conviction when the evidence was sufficient to support only one of two alternative legal theories of liability).

Agundiz-Montes replies with two points: (1) the government provided no proof that he explicitly agreed with Lara-Chavez to use proceeds from drug sales to further drug trafficking, and (2) the government's closing statement incorrectly suggested that he used the drug proceeds to pay the rent of his trailer home and other buildings. Neither of these arguments holds water.

The government correctly explains that it need not prove that Agundiz-Montes entered an explicit agreement with Lara-Chavez; instead, all it must show is that Agundiz-Montes knowingly and voluntarily joined the money-laundering conspiracy. *United States v. Martinez*, 430 F.3d 317, 333 (6th Cir. 2005) (citing *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir.

1991)).  Evidence that Agundiz-Montes used drug money to pay for rent or additional drugs was more than enough to find him complicit in a promotional-money-laundering conspiracy.

By glomming onto a single sentence of the government's closing statement, Agundiz-Montes misunderstands what constitutes evidence.  No court equates a prosecutor's closing statements with evidence.  *See Wilson*, 168 F.3d at 924 n.6.  Accordingly, we do not evaluate the government's closing argument when assessing whether a rational juror could convict Agundiz-Montes of conspiring to commit money laundering.

B)  Lara-Chavez's challenge to the sufficiency of the evidence for continuing-criminal-enterprise liability

The government must prove the following elements to convict a defendant of engaging in a continuing criminal enterprise:

> 1) that the defendant committed a felony violation of federal narcotics laws; 2) that the violation was part of a continuing series of three or more drug offenses committed by the defendant; 3) that the defendant committed the series of offenses in concert with five or more persons; 4) that the defendant acted as an organizer, supervisor, or manager with regard to these five or more persons; and 5) that the defendant obtained substantial income or resources from this series of violations.

*United States v. Avery*, 128 F.3d 966, 973 (6th Cir. 1997) (citing 21 U.S.C. § 848(c); *United States v. Elder*, 90 F.3d 1110, 1122–23 (6th Cir. 1996)).  Lara-Chavez challenges the sufficiency of the evidence for only the fourth element.

The government can establish a defendant's supervisory or managerial relationship with another individual through "evidence that [the other individual was] involved with the defendant and not independent of his control."  *United States v. Long*, 190 F.3d 471, 475 (6th Cir. 1999) (citing *United States v. King*, 169 F.3d 1035, 1042 (6th Cir. 1999)).  Classic examples include "[a] broker or courier under the defendant's direction, someone who stores drugs for the

defendant, or one who collects or launders drug proceeds." *Id.* (citing *United States v. Ward*, 37 F.3d 243, 247 (6th Cir. 1994)).

The overwhelming evidence establishes that Lara-Chavez was the organizer, supervisor, or manager of more than five individuals. Multiple coconspirators took orders from Lara-Chavez to deposit drug money, ship and receive packages of marijuana, wire money to pay for drug shipments, transport drugs across state lines, process drugs, and so on.

Lara-Chavez's counterarguments rely on cherry-picking evidence and drawing inferences in his own favor to create reasonable doubt. For example, he highlights that two witnesses testified to not personally knowing or meeting Lara-Chavez, and another thought that he earned money through a legitimate home-repair business. Lara-Chavez not only ignores all the other evidence against him, but also disregards the standard of review, which requires us to construe all evidence in the light most favorable to the government.

## V. Sentencing Challenges

A) Agundiz-Montes's Sentencing

Agundiz-Montes challenges the amount of heroin attributed to him. Although the jury held Agundiz-Montes responsible for only 100 grams or more of heroin, the Presentence Investigation Report (PSR) attributed one to three kilograms to him. At his sentencing hearing, he urged the district court to adhere to the jury's finding. The district court, however, accepted the PSR's recommendation because the "overwhelming evidence . . . given at trial" showed that Agundiz-Montes participated in and was aware of the heroin conspiracy. In doing so, the district court specifically cited two coconspirator plea agreements pegging the amount of heroin at one to three kilograms.

"We review a district court's drug-quantity determination for clear error." *United States v. Valentine*, 553 F. App'x 591, 594 (6th Cir. 2014) (citing *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)). "A factual finding is clearly erroneous where, although there is evidence to support that finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Collins*, 799 F.3d at 594 (quoting *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002)).

When a jury finds a defendant guilty of conspiring to distribute drugs, a court may hold that defendant responsible for the drugs that he *and* his coconspirators distributed. *See* U.S.S.G. § 1B1.3(a)(1)(A)–(B). For the court to hold a defendant liable for his coconspirators' distributions, however, it must make particularized findings of fact demonstrating that the distributions were within the scope of the defendant's agreement and reasonably foreseeable to the defendant. *United States v. Campbell*, 279 F.3d 392, 400–01 (6th Cir. 2002); *see also* U.S.S.G. § 1B1.3(a)(1)(B) & cmt. 3.

Agundiz-Montes contends that the district court erred twice because (1) it neglected to make particularized findings of fact when it relied almost wholly on the amount of heroin described in the plea agreements of two coconspirators, and (2) it impermissibly deviated from the jury's judgment of how much heroin to attribute to Agundiz-Montes. Neither argument proves convincing.

Although the district court relied on the codefendants' plea agreements, it did so only as a starting point for understanding the scope of Agundiz-Montes's participation in the conspiracy. In those plea agreements, the coconspirators admitted to distributing one to three kilograms of heroin. Because Agundiz-Montes's membership in the conspiracy began before and ended after that of his coconspirators, the government argued that Agundiz-Montes would have been aware

of more than the 100 to 1,000 grams directly attributed to him by the jury. Accepting this argument, the district court supplemented the plea agreements with particularized findings of fact detailing the full scope of Agundiz-Montes's agreement and the foreseeability of his coconspirators' distributions. With respect to the scope, the district court credited the prosecution's assertion that Agundiz-Montes was so deeply involved that he would have known the full extent of the heroin distribution. As far as foreseeability, the district court cited the testimony of coconspirator Elizabeth Garcia, who testified that Agundiz-Montes was present during heroin transactions, obtained heroin to sell several times, and directed her to transport money from heroin sales. *See Valentine*, 553 F. App'x at 597. The district court noted that "many others" in the record corroborated this portrayal of Agundiz-Montes's involvement.

Finally, a district court may deviate from a jury's finding on drug quantity so long as the final sentencing determination stays between the statutory minimum and maximum triggered by the jury's verdict. *United States v. Johnson*, 732 F.3d 577, 584 (6th Cir. 2013). The jury here attributed between 100 and 1,000 grams of heroin to Agundiz-Montes, generating a mandatory minimum of 5 years of imprisonment and a maximum of 40 years. *See* 21 U.S.C. § 841(b)(1)(B)(i). Although the district court increased the heroin attributable to Agundiz-Montes to more than 1,000 grams, the sentence resulting from this upward revision—155 months' imprisonment—fell within the 5-to-40-years range. Thus, the district court committed no error.

B) Lara-Chavez's Sentencing

Lara-Chavez argues that the district court erred because it neglected to consider his "history and characteristics," as required under 18 U.S.C. § 3553(a)(1). But the district court's oral opinion at the sentencing hearing contradicts this claim.

We review a district court's sentencing determination for procedural and substantive reasonableness "under a deferential abuse-of-discretion standard." *United States v. Dudeck*, 657 F.3d 424, 431 (6th Cir. 2011) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). But when a defendant fails to object at the sentencing hearing when given an opportunity to do so, we review for plain error. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc). The government suggests that Lara-Chavez did not raise a proper objection at sentencing, so we should apply plain-error review to his procedural-reasonableness claim. The record, however, shows mixed support for the government's assertion. Ultimately, we need not resolve the proper standard of review because even under the standard more favorable to Lara-Chavez, the district court did not abuse its discretion.

At the sentencing hearing, the district court adopted the findings of Lara-Chavez's PSR and calculated an advisory Sentencing Guidelines range of 300 to 353 months' imprisonment. Lara-Chavez did not object to this calculation, but sought the bottom of the range, stressing that his history and characteristics—particularly his holding "various jobs to support his family"—demonstrated his capacity to become a productive member of society. The government opposed a 300-month sentence, advocating instead for an above-Guidelines sentence of 360 months. It emphasized his prior criminal offenses—drug trafficking, food stamp fraud, and falsification of worker's compensation claims—and the seriousness of the current drug-trafficking conspiracy. After considering the totality of the factors listed under 18 U.S.C. § 3553(a), the district court settled on 353 months.

On appeal, Lara-Chavez raises only a procedural reasonableness claim. A sentence is procedurally unreasonable "where [the] 'district judge fails to consider the applicable Guidelines range or neglects to consider the other factors listed in 18 U.S.C. § 3553(a).'" *United States v.*

*Erpenbeck*, 532 F.3d 423, 436–37 (6th Cir. 2008) (quoting *United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006)).

To support his claim that the district court procedurally erred by not considering his history and characteristics, Lara-Chavez argues that the district court ignored his assertion that he could be a productive member of society. He also points to his own statement that he is "not a dangerous person." Finally, to prove that the district court overemphasized Lara-Chavez's criminal history, Lara-Chavez singles out this statement by the district court: "It seems like now you've got a true career offender who is not getting punished."

Contrary to Lara-Chavez's argument, the district court not only took Lara-Chavez's personal history and characteristics into account, but also accepted that Lara-Chavez's capacity to become a productive member of society weighed *against* the government's request for an above-Guidelines sentence. Unfortunately for Lara-Chavez, the district court determined that this factor could not offset the other § 3553(a) factors, "all [of which] support[ed] a top of the guideline sentence." The district court made this clear to Lara-Chavez at the sentencing hearing, where it evaluated how each § 3553(a) factor influenced his sentencing determination and explained how the gravity of his offenses—bringing drugs into the community, growing marijuana, creating a drug conglomerate—warranted a top-of-the-Guidelines sentence. As for the quotation regarding Lara-Chavez's status as a "true career offender," the district court was speaking in the context of a hypothetical and not referring to Lara-Chavez.

Accordingly, the district court did not abuse its discretion.

## VI. Conclusion

For these reasons, we AFFIRM the district court's judgments with respect to both appellants.