**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0723n.06

Case Nos. 19-5894/5911/5943/6032

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Dec 30, 2020<br>DEBORAH S. HUNT, Clerk |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE EASTERN |
| TIMOTHY DENNIS GOWDER, ANWAR | ) | DISTRICT OF KENTUCKY |
| MITHAVAYANI, JAMES BRADLEY COMBS, | ) |  |
| and PETE ANTHONY TYNDALE, | ) | OPINION |
|  | ) |  |
| Defendants-Appellants. | ) |  |

**BEFORE: BATCHELDER, CLAY, and BUSH, Circuit Judges.**

**JOHN K. BUSH, Circuit Judge.** Defendants appeal their convictions for several different charges that arose out of the Drug Enforcement Administration's investigation of the Tennessee Pain Institute (TPI). On the surface, TPI was a pain clinic that Defendants Anwar Mithavayani and Pete Tyndale owned, where Defendant Timothy Gowder served as lead physician, and where Defendant James Combs obtained prescriptions for drugs. After a twenty-day trial, a jury deliberated for three days before acquitting each defendant on some charges and convicting them of others, and fully acquitting the clinic's other doctor, Dr. Gary Moore. On appeal, Defendants raise a plethora of challenges. Because we find their arguments unavailing, we affirm their convictions.

**BACKGROUND**

The United States charged Gowder, Mithavayani, Tyndale, and Moore with conspiracy to distribute narcotics and conspiracy to launder money, conducting transactions with criminally derived proceeds under 18 U.S.C. § 1957, and conducting transactions with criminally derived proceeds with the intent to conceal under 18 U.S.C. § 1956. Combs was charged with participation in the drug conspiracy and possession of oxycodone with intent to distribute. After a twenty-day trial and three days of deliberations, the jury acquitted Moore of all charges, acquitted Combs of the drug conspiracy but convicted him of possession with intent to distribute, and convicted Gowder, Mithavayani, and Tyndale of the drug conspiracy and some money-laundering charges but acquitted them of other money-laundering charges. Gowder, Mithavayani, Tyndale, and Combs appeal the judgments against them.

**DISCUSSION**

**I.      Sufficiency of the Evidence**

Formally, a defendant receives de novo review of the district court's denial of a motion for a judgment of acquittal under Federal Rule of Civil Procedure 29. *United States v. Collins*, 799 F.3d 554, 589 (6th Cir. 2015). But he still bears "a very heavy burden" because we apply the same standard that the district court applies in evaluating a Rule 29 challenge to a conviction's evidentiary sufficiency. *Id.* (quoting *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)). Under that standard, we examine the evidence in the light most favorable to the Government, draw all inferences in the Government's favor, and resolve every issue of credibility in favor of the guilty verdict. *United States v. Sumlin*, 956 F.3d 879, 891 (6th Cir. 2020). As long as "any rational trier of fact could have found the elements of the offense beyond a reasonable doubt," we must affirm. *Id.* (quoting *United States v. Maliszewski*, 161 F.3d 992, 1005 (6th Cir. 1998)).

**A. Sufficiency of the Evidence for Conspiracy to Distribute Drugs**

To convict a defendant for conspiracy to distribute drugs in violation of 21 U.S.C. § 846, the Government must prove: (1) an agreement, (2) knowledge of and intent to join the conspiracy, and (3) participation. *United States v. Elliott*, 876 F.3d 855, 863 (6th Cir. 2017). Gowder, Mithavayani, and Tyndale primarily challenge the second prong, arguing that the Government did not produce sufficient evidence that they knew of and intentionally joined the conspiracy. The Government does not need to show direct evidence of knowledge; it need only present enough evidence for "guilty knowledge and *voluntary participation* [to] be inferred from surrounding circumstances." *United States v. Sadler*, 750 F.3d 585, 593 (6th Cir. 2014) (quoting *United States v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991)).

*Sadler*, for example, held that a defendant had knowledge that he was participating in a drug-distribution conspiracy because he continued to operate two branches of a pain clinic "*after* previous clinics had been shut down and *after* the DEA searched his home and office in 2008." *Id.* Similarly, in *United States v. Chaney*, evidence showing that a non-doctor knew that a doctor had used pre-signed prescriptions, and that the non-doctor had distributed those slips on occasion, sufficed to establish a conspiracy to distribute drugs. 921 F.3d 572, 592 (6th Cir. 2019). And in *Elliott*, we held that a security guard's efforts to impede investigators' efforts by clearing the parking lot of patients, chasing off the investigators, and warning patients of their presence sufficed to show knowing participation in the conspiracy. 876 F.3d at 863. In light of those precedents, it is clear that the Government had sufficient evidence to support Mithavayani's, Gowder's, and Tyndale's convictions.

###### 1. *Mithavayani and Tyndale*

Mithavayani and Tyndale both argue that they were, in effect, unwitting owners who did not know what their doctors were doing and were not qualified to understand the medical aspects of the clinic's practice. They claim that their convictions rely on a respondeat superior theory that criminal law does not permit. But their arguments disregard a significant body of evidence that the two men had a background in a Florida pill mill, carefully designed the clinic to avoid detection by law enforcement (and instructed an employee to lie to investigators when that design failed), knew of their doctors' dubious prescribing practices, and sought to recreate TPI in North Carolina when the DEA shut TPI down. That evidence sufficiently supports the jury's verdict, so we must affirm.

As an initial matter, the Government thoroughly proved that TPI was a pill mill. The jury heard patient after patient describe their hours-long drives to get to TPI, where they paid with cash or card (TPI did not accept insurance) and left with a prescription for large quantities of painkillers after a minutes-long visit with Gowder or Moore. It heard a manager describe how complaint forms about patients' abusing or selling drugs just piled up on her desk, rarely leading to discharge. It heard of a policy instructing staff to schedule as many as eight patients per hour. It heard a veteran police officer's expert testimony about the numerous "red flags" the facility raised. And, finally, it heard an expert pain doctor's testimony that every single file he examined showed amounts and combinations of drugs prescribed that were never appropriate and served no legitimate medical purpose. Although Defendants attempted to impeach the experts, we must credit the experts' analysis at this stage. *See Sumlin*, 956 F.3d at 891. Thus, the question that remained for the jury was whether Mithavayani and Tyndale were oblivious to their business's true nature.

First, the Government presented extensive evidence about an earlier pill mill in Florida with which Tyndale was intimately involved. The district court described that operation as the "headwaters of the [TPI] conspiracy." The jury heard sufficient testimony to credit that view, so we must do the same. Jenna Crawley, Tyndale's ex-girlfriend, described Tyndale's association with that pill mill, an operation in which her involvement led to jail time. For example, Tyndale ran a cash-only MRI business out of a strip-club parking lot that catered to out-of-town customers on their way to pill mills. Tyndale even advertised in those pill mills, and when one pill mill moved north to Jacksonville, he was integral in recruiting new customers for it. Most damningly, when he connected Crawley to the pill mill, the owner immediately made her a part owner on paper. Crawley explained that she had to be the part owner because "Pete couldn't own an MRI facility and a pain clinic." Finally, Crawley described how Tyndale had told her of his plan to open a new "clinic" closer to the many out-of-state patients who traveled to Florida for drug prescriptions. When he learned that the DEA had shut down the Florida pill mill, he even told her that he thought he could bring some of its patients to the clinic he planned to open. The jury could easily conclude that Tyndale knew what he was doing.

Although the prosecution did not connect Mithavayani as closely to the Florida pill mill, Crawley did testify that Mithavayani had serviced Tyndale's pill-mill-serving MRI business, and that "ever since I've known Pete, he's had dealings with [Mithavayani]." Given that connection, the jury could reasonably infer that Mithavayani had some knowledge of Tyndale's dealings in Florida. We must respect that inference. *See Sumlin*, 956 F.3d at 891.

Second, when Tyndale and Mithavayani came to Tennessee to start TPI, they hired a staff with no clinical experience, then failed to train them in the types of work—pill counts, recognizing abuse, etc.—that pain-clinic staff would need. For example, they hired Julie Hankins, who had a

degree as a surgical technician, away from her job in fast food and immediately made her the clinic's manager. For the lead physician they hired Gowder, who had retired from a thirty-plus-year career as an obstetrician and had no experience in pain management.

Third, the owners then implemented a set of rules and policies that the Government's expert, Officer Dalrymple, considered "red flags." For example, TPI did not take insurance and accepted prepaid debit cards instead of exclusively taking cash because, according to the Government's expert, too much cash would raise eyebrows at banks. The only treatment TPI offered was painkiller prescriptions. Many of its patients traveled hundreds of miles, often in groups to get those prescriptions. And many of those patients had come from pain clinics that law enforcement had shut down. TPI also had very limited medical equipment. It required urine screens and MRIs to "paper the files," but it generally ignored the results. And it paid doctors per patient. When the DEA investigators began to ask questions, Tyndale even instructed one employee to lie about that suspicious pay structure. The red flags piled up high enough for the jury to reasonably find that Mithavayani and Tyndale implemented those policies to create an efficient pill mill that retained enough of a veneer of legitimacy to avoid investigation.

Fourth, Mithavayani and Tyndale also had ample notice of their doctors' problematic prescribing practices. They learned that their doctors may have been overprescribing pills in 2012, early in TPI's existence, because the Tennessee Department of Health began to investigate Gowder and Moore. The two owners dutifully paid the doctors' legal fees throughout the four-year proceedings, but they did nothing to curb the doctors' over-prescribing. The Department of Health investigation ended only when the doctors reached a settlement by acknowledging that their prescription practices were "not medically necessary, advisable, or justified."

Finally, when the Government closed TPI, Tyndale and Mithavayani moved the operation to North Carolina because, as the two owners told one employee, "the laws were not as strict" there. They invited their TPI patients to follow, and moved doctors around to ensure that former TPI patients would receive the kinds of prescriptions that justified traveling all the way to North Carolina. The jury could easily conclude that those were not the acts of innocent men.

In short, a reasonable jury—after sitting through twenty days of that evidence—could conclude that Tyndale and Mithavayani knew they were part of a conspiracy to distribute drugs.

2. *Gowder*

In *United States v. Geralt*, we held that a doctor issuing excessive prescriptions with little information about each patient permitted the jury to infer that the doctor knew he was part of a pill mill. 682 F. App'x 394, 401–02 (6th Cir. 2017). The same logic applies here with perhaps greater force.

The jury heard testimony that Gowder performed extremely cursory medical examinations before prescribing large quantities of drugs. That closely tracks the facts of *Geralt*. Moreover, Dr. Eason, an expert witness on pain management, testified that every single file he reviewed—30 randomly selected, 12 chosen by the Government—showed illegitimate prescribing practices, with amounts and combinations of drugs that served no legitimate medical purpose. Finally, the jury learned that Gowder had given a sworn statement to the Tennessee Board of Medical Examiners admitting to prescribing controlled substances without medical justification. Hearing that evidence, a reasonable jury could conclude that Gowder knew he was part of a drug-distribution conspiracy.

**B. Sufficiency of the Evidence for Money Laundering Under 18 U.S.C. § 1957**

18 U.S.C. § 1957 criminalizes knowingly engaging in a transaction in "property of a value greater than $10,000" that is derived from specified unlawful activity. Defendants argue that the Government had an obligation to trace the money to show that at least $10,000 of the funds actually came from criminal behavior, as opposed to innocent treatment efforts. There is a circuit split on that question, one we have declined to take a side on in the past. *See United States v. Jamieson*, 427 F.3d 394, 404–05 (6th Cir. 2005). We similarly decline to decide the issue here because Defendants' argument has a fatal flaw: they had no lawful income that the Government needed to separate out.

At trial, the Government produced sufficient evidence for the jury to conclude that TPI was purely a pill mill without any legitimate medical ends. For example, the Government's expert, Dr. Eason, testified that not one of the 42 files he reviewed showed legitimate medical work. The overall prescribing figures supported his conclusions, showing that 90% of TPI's prescriptions were for oxycodone, Xanax, and oxymorphone. In addition, as discussed above, the testimony from patients and employees saying that TPI was nothing more than a pill mill was overwhelming. Patients told harrowing tales of driving hours to get to TPI, paying with a debit card, and leaving with a prescription for large quantities of painkillers after only a minutes-long visit with Gowder or Moore.

The jury's acquittal of Moore does not undermine the likelihood that it concluded that TPI was nothing more than a pill mill. As the district court noted in its opinion denying Mithavayani and Tyndale's Rule 29 motion, "[t]he jury could have found (and, as the Court views the full record, likely did find) that Moore, though working and generating income for a drug trafficking conspiracy, was not a knowing and voluntary participant in the criminal enterprise." That one

doctor did not know he was furthering a criminal conspiracy does not negate that conspiracy's existence; it negates only Moore's guilt.

Gowder also challenges the propriety of venue in the Eastern District of Kentucky for his counts under 18 U.S.C. § 1957. Venue for a § 1957 charge is proper in "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." *United States v. Myers*, 854 F.3d 341, 349 (6th Cir. 2017) (quoting 18 U.S.C. § 1956(i)(1)(B)). The "underlying specified unlawful conduct" for the § 1957 counts was distribution of a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. Gowder disputes only whether he participated in the transfer of funds from the Eastern District of Kentucky to Tennessee. The Government had the burden to establish his participation by a preponderance of the evidence and "[s]ince the jury found that the government did so, . . . we can only reverse if no rational juror could have come to that conclusion." *United States v. Petlechkov*, 922 F.3d 762, 769 (6th Cir. 2019).

Although participation presents a close question, a jury could reasonably have concluded that by knowingly prescribing drugs to patients who would sell them in the Eastern District of Kentucky and bring the money back to TPI for more prescriptions, Gowder participated in the transfer of proceeds from the Eastern District of Kentucky to Tennessee. The jury saw sufficient evidence to conclude that Gowder knew his patients were selling drugs, so it could infer his knowing participation in the transfer of drug proceeds by a preponderance of the evidence.

**C. Sufficiency of the Evidence for Conspiracy to Commit Money Laundering Under 18 U.S.C. § 1956**

Only Mithavayani challenges his and Tyndale's conviction for conspiracy to commit money laundering under 18 U.S.C. § 1956. The Government can prove conspiracy to commit

money laundering under either a promotional theory, *see* 18 U.S.C. § 1956(a)(1)(A)(i), or a concealment theory, *see id.* § 1956(a)(1)(B)(i). A concealment theory requires the Government to show that Mithavayani and Tyndale conspired to conduct a financial transaction with criminal proceeds, knowing that the transaction was designed, "in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the money." *United States v. Agundiz-Montes*, 679 F. App'x 380, 387 (6th Cir. 2017) (quoting *United States v. Reed*, 264 F.3d 640, 650–51 (6th Cir. 2001)). A promotion theory requires the Government to show that Mithavayani and Tyndale conspired to conduct a financial transaction that involved the proceeds of unlawful activity with the intent to promote the underlying criminal activity. *Id.*

Mithavayani initially contends that the jury was not properly instructed on a promotion theory. He failed to challenge the instruction below, so we can reverse only if "taken as a whole, the jury instructions were so clearly erroneous as to produce a grave miscarriage of justice." *United States v. LaVictor*, 848 F.3d 428, 454 (6th Cir. 2017) (quoting *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006)). Taking the jury instructions as a whole, the jury received instruction on the promotion theory. In the conspiracy instruction, the district court referenced both Count Five of the superseding indictment, which laid out both theories, and its earlier substantive instruction on § 1956 money laundering, which also described both a promotion theory and concealment theory. Those references sufficiently presented the promotion theory to the jury.

And Mithavayani's guilt on a promotion theory is clear. We can affirm a promotion conviction when the defendant reinvested criminally derived proceeds into the illegal activity that generated the proceeds. *United States v. Cosgrove*, 637 F.3d 646, 654 (6th Cir. 2011). Here, Mithavayani did just that, reinvesting proceeds from TPI into keeping TPI running.

## II. Evidentiary Challenges

We review challenges to the district court's decision to admit evidence for an abuse of discretion. A district court abuses its discretion when it applies the wrong legal standard, misapplies the legal standard, or relies on clearly erroneous findings of fact. *Collins*, 799 F.3d at 570.

### A. Evidence of the Florida Pill Mills

The Government introduced extensive evidence detailing Tyndale's involvement in a pill mill in Florida and testimony tying Mithavayani to Tyndale during that period. Tyndale and Gowder contend that the Florida evidence was improper "other acts" evidence under Rule 404(b). But the district court determined as a factual matter that the Florida pill mill actually constituted the beginning of Tyndale and Mithavayani's drug-distribution conspiracy, a conspiracy that then included running TPI and the North Carolina clinic. If that finding was correct, then this evidence was "evidence relating to the background of the charged offense, known as '*res gestae* evidence,'" that was directly probative. *United States v. Sumlin*, 956 F.3d 879, 889 (6th Cir. 2020).

We only disturb a district court's finding of fact if it is clearly erroneous. Evidence is clearly erroneous if it strikes the court as "more than just maybe or probably wrong; it must strike us as wrong with the force [of] a five-week-old, unrefrigerated dead fish." *United States v. Lanham*, 617 F.3d 873, 888 (6th Cir. 2010) (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990)). The district court's determination that Tyndale's involvement in the Florida pill mill constituted the "headwaters" of the conspiracy does not meet that standard. Crawley's testimony about Tyndale's intent to bring patients from the Florida pill mill to TPI justifies the district court's finding that the Florida evidence constituted the start of the conspiracy. And even though Gowder did not join the conspiracy until TPI opened, "[i]t has long been established that a conspirator may

join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined." *Collins*, 799 F.3d at 579 (quoting *United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004)).

**B. Admitting Officer Dalrymple's Expert Testimony**

Tyndale contends that although this court often allows law enforcement to testify as experts, the district court abused its discretion by permitting Officer Dalrymple to testify because his analysis was insufficiently reliable under *Daubert*. But rigidly applying *Daubert* makes little sense in this context. *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007). *Daubert* is a case about scientific expertise. Thus, although district courts "*may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine" an expert's reliability, "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The district court reasonably looked beyond those factors here.

The district court permitted Officer Dalrymple to testify because it found that his expertise on the characteristics of a typical pill mill would aid the jury. In making its determination, it looked to his "personal knowledge or experience" rather than the *Daubert* factors, an approach we approved in *Surles*. 474 F.3d at 295. And Officer Dalrymple had ample experience, including fifteen years in law enforcement, numerous drug-trafficking investigations, and more than a dozen pill-mill investigations. That experience justified the district court's reliability determination.

**C. Rule 403 Challenges**

A district court may properly exclude evidence under Federal Rule of Evidence 403 if "its probative value is substantially outweighed by a danger of" unfair prejudice, misleading the jury, or harms to a fair and efficient trial. When reviewing the district court's application of that already

high bar, we must give evidence "its maximum reasonable probative force and its minimum prejudicial value." *Collins*, 799 F.3d at 577 (quoting *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003)). Our deference to the district court's application of an already deferential standard requires a Herculean labor by Defendants to establish reversible error. Here, none of Defendants' arguments are strong enough.

### 1. *Combs's Phone Call*

On a phone call from prison, in the midst of a fairly mundane conversation, Combs angrily called two men who provided evidence against him—one who directed the police to his house, the other who filled out a statement for the police—"rats" and "cheese-eaters" and accused one of them of "signing statements" and "stabbing him in the back." The district court found that those statements showed consciousness of guilt because "[a]ny time a person is complaining about someone who has allegedly ratted, especially with the—the vigor and intensity reflected on the call, that is strong evidence that there—arguably there is something nefarious to be ratted on about." Combs testified that he was also angry at one of the men for, in Combs's mind, breaking up his marriage. But the presence of a mixed motive for his diatribe does not sufficiently undermine its probative force that the risk of prejudice from his portrayal as "angry, vengeful, and perhaps dangerous" would substantially outweigh that probative value.

### 2. *Prospective Hire's Arrest for Drug Distribution*

The district court admitted evidence that a doctor whom TPI had hired was arrested for participating in a Florida pill mill before he could begin to work at TPI. It found the evidence relevant both to TPI's hiring practices and to the type of doctor that TPI attracted. Giving the evidence its maximum probative force in those regards, it is difficult to say that the district court abused its discretion in concluding that the risk of prejudice from guilt by association did not

substantially outweigh the evidence's probative value. A reasonable jury could find that Tyndale and Mithavayani knew they were running a pill mill, given that TPI recruited a doctor whose curriculum vitae displayed inconsistent work history, high patient volume, and per diem employment from the Florida-pill-mill scene that Tyndale knew well. And the fact that such a doctor would want to work at TPI has some probative value, limited as it may be, to prove that TPI had noticeable indicators of being a pill mill.

### D. Gowder's cumulative error challenge

Unlike the other Defendants, Gowder does not argue that any one supposed evidentiary error so prejudiced him that it warrants reversal of his conviction. Instead, he argues that here, "the cumulative effect of errors that are harmless by themselves" was so prejudicial as to warrant a new trial. *See United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012). To win such a challenge, a defendant must show that the cumulative effect of the errors was so extreme that it deprived the defendant of his constitutional right to due process of law. *Id.* Here, Gowder fails even to show error, let alone such egregious error as to constitute a denial of due process.

#### 1. The Transcripts and Findings from the Tennessee Department of Health

Gowder challenges the admission of his express, sworn statements that he had issued prescriptions that were "not medically necessary, advisable, or justified," arguing that the district court abused its discretion in declining to find that evidence was substantially more prejudicial than probative. To describe the argument suffices to show its futility; a sworn statement that he knowingly overprescribed drugs is highly probative evidence of his knowledge that TPI was a pill mill. To the extent that the lower standard of proof in the civil proceeding could have caused juror confusion, the district court gave a jury instruction to clarify the difference.

### 2. *The Rite-Aid Letter*

Gowder next challenges the admission of a letter from Rite-Aid, a pharmacy chain, informing him that it would no longer fill prescriptions from TPI because it had concerns about prescription drug abuse. He contends that the letter was inadmissible hearsay. The district court admitted the letter as non-hearsay evidence that Gowder had notice that clients were abusing his prescriptions. As discussed above, Gowder's primary defense against the conspiracy charge was his argument that he did not know TPI was a pill mill. Relevant rebuttal to that contention was notice that a pharmacy would no longer fill TPI's prescriptions. Thus, the letter was not used for a hearsay purpose.

Because two of Gowder's three assignments of error fail, and he acknowledges that the individual effect of each error does not warrant reversal, we need not reach his argument about the evidence of patients' other drug conspiracies.

### III. Other Trial Challenges

#### A. Gowder's Severance Motion

Gowder did not move for severance until six months after the deadline for defensive motions. The district court did not abuse its discretion in denying such an untimely motion. *See United States v. Wilson*, 972 F.2d 349, *4 (6th Cir. 1992) (unpublished table decision).

#### B. Deliberate-Ignorance Instruction

Mithavayani argues that the district court abused its discretion by instructing the jury that it could find that he knew of the conspiracy through evidence of his deliberate ignorance. Courts may give a deliberate-ignorance instruction if the defendant claims lack of knowledge and the facts and evidence support an inference of deliberate indifference. *United States v. Asker*, 676 F. App'x 447, 464–65 (6th Cir. 2017). Here, Mithavayani certainly claimed a lack of knowledge, and the

evidence laid out above—Gowder and Moore's Department of Health investigation, patients' abuse of drugs, his relationship with Tyndale in Florida—would have made it difficult for him not to learn of TPI's nature as a pill mill. Therefore, a deliberate-ignorance instruction was proper.

### C. Good-Faith Jury Instruction

Mithavayani also argues that the district court committed plain error when it failed to instruct the jury that Mithavayani could also avail himself of the good-faith defense, which protects a doctor who writes a prescription in good faith from prosecution for a drug-distribution conspiracy. To show plain error for a jury instruction, Mithavayani must show that "taken as a whole, the jury instructions were so clearly erroneous as to produce a grave miscarriage of justice." *LaVictor*, 848 F.3d at 454 (quoting *Newsom*, 452 F.3d at 605). He cited no authority for the proposition that the good-faith defense extends to the owners of clinics. It cannot be a grave miscarriage of justice for a judge to decline to give a novel jury instruction that a party did not even request.

### IV. Sentencing Discussion

We review a sentence's reasonableness for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 46 (2007).

### A. Procedural Reasonableness

Gowder challenges the procedural reasonableness of his sentence. A sentence is procedurally unreasonable if the district court improperly calculates the range under the U.S. Sentencing Guidelines, treats the Guidelines as mandatory, fails to consider the factors under 18 U.S.C. § 3553(a), bases a sentence on clearly erroneous facts, or fails to adequately explain the sentence. *Id.* at 51. We review the findings of fact that undergird a Guidelines determination for clear error. *United States v. Hodge*, 805 F.3d 675, 678 (6th Cir. 2015). Gowder challenges two

aspects of his sentence: the imposition of a leadership enhancement, and the district court's calculation of the relevant drug quantity.

Gowder disagrees with the district court's finding that Moore, whom he supervised, was a criminal participant in the drug-distribution conspiracy. Despite Moore's acquittal at trial, the district court concluded that Moore was a criminal participant based on the lower preponderance-of-the-evidence standard that applies at sentencing. That finding was not clear error, as ample evidence at trial showed that Moore overprescribed drugs without regard for the evidence of abuse that was apparent at TPI. So the leadership enhancement was not procedurally unreasonable.

As for the drug-quantity calculation, Gowder argues that the Government did not offer sufficiently precise proof of the quantity of drugs attributable to him. We do not reverse the district court's determination as to drug quantity unless it is clearly erroneous. *United States v. Sadler*, 750 F.3d at 593. If the district court cannot determine the precise quantity of drugs, it can make an estimate as long as a preponderance of the evidence supports its finding. *Id.* In *Sadler*, we also noted that in cases of jointly-undertaken criminal activity, a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* at 594 (quoting *United States v. Wilson*, 168 F.3d 916, 922 (6th Cir. 1999)). Our recent application of that standard in *United States v. Tisdale* clarifies it. 980 F.3d 1089 (6th Cir. 2020). There, we upheld a district court's decision to estimate the quantity of drugs a gang-member defendant was responsible for by multiplying the quantity of drugs a gang moved each day by the number of days that defendant spent in the gang. *See id.* at 1096–97.

Here, the district court could reasonably have held Gowder responsible for all foreseeable drug prescriptions from TPI, as it found that all of TPI's prescriptions were part of the distribution conspiracy in which Gowder knowingly participated. Instead, it based its sentencing calculation

on a more modest 25% of the total prescriptions, noting that that quantity sufficed to reach the highest-base-offense level for drug quantity. That approximation was reasonable. A district court can "hold a defendant responsible for a certain quantity of drugs" if it can conclude that he "is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)). The district court could conclude by a preponderance of the evidence that Gowder was responsible for far more than 25% of TPI's prescriptions; thus, its conservative estimate was not procedurally unreasonable.

**B. Substantive Reasonableness**

A sentence is substantively unreasonable "if it is longer than necessary to achieve the goals laid out in 18 U.S.C. § 3553(a)." *United States v. Lightning*, --- F. App'x. ---, 2020 WL 6625029, at *2 (6th Cir. Nov. 12, 2020). Our substantive-reasonableness review begins with the range the Sentencing Guidelines recommend because "in the ordinary case," that range will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)).

*1. Tyndale*

Tyndale's Guidelines recommendation was 130 years. He received a 29-year sentence, well below his Guidelines range. We apply a presumption of reasonableness to a within-Guidelines sentence, so "a defendant attacking the substantive reasonableness of a *below*-Guidelines sentence has an even heavier burden to overcome." *United States v. Elmore*, 743 F.3d 1068, 1076 (6th Cir. 2014). Tyndale cannot overcome that burden. The district court thoroughly and thoughtfully explained its reasons for imposing a 29-year sentence. It concluded that numerous facts justified the lengthy sentence: Tyndale's role as the conspiracy's mastermind, the

fact that the conspiracy distributed 1.6 million oxycodone doses to addicts and drug peddlers, his clear disregard for the law by opening a new clinic in North Carolina immediately after the DEA closed TPI, the need to deter people from engaging in such a profitable and difficult-to-detect crime, and his lack of remorse. Those reasons more than support Tyndale's 101-year-below-Guidelines sentence.

### 2. *Combs*

Combs received a within-Guidelines sentence of 151 months. We presume that a within-Guidelines sentence is reasonable. *United States v. Smith*, 881 F.3d 954, 960 (6th Cir. 2018). Combs's contention that the district court failed to properly balance the § 3553(a) factors does not suffice to rebut that presumption. First, "[Combs's] argument ultimately boils down to an assertion that the district court should have balanced the § 3553(a) factors differently." *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008). As such, "it is 'simply beyond the scope of our appellate review, which looks to whether the sentence is reasonable, as opposed to whether in the first instance we would have imposed the same sentence.'" *Id.* (quoting *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006)). And second, the district court had ample reason not to vary downward—Combs threatened a witness, committed perjury, and assaulted one of his cellmates.

### V.    Conclusion

For the above reasons, we affirm Defendants' convictions and sentences.